THE PEOPLE, etc., Plaintiffs in Error, v. ROGER LAMB,
Defendant in Error.

Upon a trial for murder, testimony concerning the quarrelsome and vin-
dictive character of the person killed, is only admissible where it has
been shown in the case that the prisoner, at the time of committing the
deed, had reason to be in fear of his life, or reasonable ground to appre-
hend great bodily harm. (See the long array of authorities cited in the
opinion of DAVIES, Ch. J.)

*It seems* that it is not sufficient that the accused had an *impression* that he
was in danger of bodily harm, but it must be an impression warranted
by the circumstances.

Evidence concerning the previous good character of the accused must be
duly considered by the jury, and a charge that the jury may, in their
discretion, reject such evidence entirely, is erroneous.

Where the jury have a reasonable doubt, from the evidence, as to what
degree of murder to convict the prisoner of, it is their duty to convict
of the lesser degree. SMITH, J.

Where the several features of a charge, although perhaps not amounting
to errors, are calculated to confirm a wrong impression in the minds of
the jury, produced by an erroneous ruling in respect to evidence of the
good character of the accused, a new trial will be granted. *Id.*

A charge that a design to take life constitutes murder in the first degree,
is not the statutory definition of murder in the first degree; and the
judge should instruct the jury that it requires a *premeditated design* to
convict of that offense. MORGAN, J.

*A. Oakey Hall*, for the plaintiffs in error.

*William F. Kintzing* and *A. S. Cohen*, for the defendant
in error.

DAVIES, Ch. J. The prisoner was indicted and convicted
in the New York General Sessions for the murder of his
wife, Joanna Lamb. The prisoner and his wife occupied a
room in Oak street in that city, and at the time of the homi-
cide there were present in the room the prisoner and his
wife, Ann Kennedy, Mary Riley, Bridget Curtis, and a little
girl named Joanna Clifford, who was the daughter of the
deceased by a former husband, and then aged about eight
years. The prisoner and his wife, according to the testimony
of Kennedy, came together into the room about six or seven

o'clock in the evening. The first thing the witness observed was the prisoner, applying a vile epithet to the deceased, and then made at her with his fist. The prisoner was prevented from assaulting his wife by the witness and another woman, or rather the assault intended for her was inflicted upon the witness. The prisoner then took a stick and attempted to hit his wife, but was prevented by the woman Riley. He then struck the deceased with his fist. Saw the prisoner have a knife in his hands. This witness then left the room to procure some water for the deceased, which she said she wanted, and on her return she met the prisoner going out; he passed her. She found the deceased in the room, all covered with blood. Mary Riley, the little girl, and Bridget Curtis, were then in the room with deceased. She testified that at this time the deceased made no attempt to strike the prisoner. She identified the knife as that of the prisoner, and there was no question made but that the prisoner inflicted the fatal wound of which the deceased died. Mary Riley testified that the deceased came in about two minutes before the prisoner, and her statement of what occurred up to the time Ann Kennedy left the room was similar to that made by her. The prisoner, according to the witness' statements, got his two hands on her chest, and pitched her over against the bed, and she fell between the bed and the stove. When she arose, the deceased was bleeding, and the witness said to the prisoner: " You murderer, you have killed your wife." He made no reply, but stooped down, tied his shoes, and walked out. She also testified that the deceased did not go near the prisoner at all, but he ran at her. On this night she never saw the deceased raise hand or foot against the prisoner.

Bridget Curtis, the other person present in the room, as testified to by the other witnesses, was in bed, and she says asleep; that the noise of the tussel awoke her. When she awoke, the deceased was bleeding, lying on the floor. The prisoner was then in the room, but did not remain, but went out.

Joanna Clifford, the other person present, testified to the same facts as the other witnesses as to the conduct of the

prisoner, and his assault of the deceased; and added that after he knocked Mrs. Riley down, he came alongside of the deceased and stabbed her in the neck with a black handled penknife; he stabbed her once; the witness was sitting on her lap at the time he stabbed the deceased.

For the defense, Mary Driscoll was called, who testified that she was in this room on the evening of the homicide, and that the prisoner went out, and as he went out the deceased then flung the lid of an iron kettle after him at the door, and he came back and made a blow at her with his hand. She afterward testified, that at the time she threw the lid at him he went out and came back in fifteen minutes and sat on the chair. The little girl, Joanna Clifford, testified that she went for Officer O'Day, and he testified that when he went to the premises he found Ann Kennedy, Mrs. Riley, and Bridget Curtis there, and the little girl was there. He also testified that he did not see Mary Driscoll there; and Ann Kennedy and Mary Riley both swore that Mary Driscoll was not there that evening; and the same inference may be drawn from the testimony of Bridget Curtis and the little girl Joanna. I think the jury might have been warranted in finding that Mary Driscoll was not present at the time of the homicide, and even if she was that her testimony, as to any provocation having been offered by the deceased, or any assault made upon the prisoner by her, or any attempted or threatened, were wholly unsupported by any evidence, or any corroborating circumstance. The jury might well say there was not a scintilla of evidence to sustain the theory of the prisoner's defense, namely, that when the prisoner struck the blow which caused her death, he had a reasonable ground to apprehend a design on the part of his wife to do him some great personal injury or bodily harm, and that therefore he believed there was imminent danger of such design being accomplished.

I cannot discover, from a very careful examination of the testimony in this case, any ground upon which such a theory can rest. Assuming, for the sake of the argument, that Mary Driscoll was present at the time of the occurrence, and that

her statement of what transpired is to be credited, then this defense is equally baseless. For, according to her statement, the only ground he had to apprehend a design on the part of his wife to do him some great personal injury or bodily harm, and from which he could believe there was imminent danger of such design being accomplished, was the circumstance that, as he was leaving the room in which the deceased was, she threw the lid of an iron kettle after him at the door. Now, there was no evidence that he knew or saw this thing thrown after him, but the strong inference is that he knew nothing about it. He was going out of the room, and it was flung after him at the door, that is, as I understand it, as he was passing out of the door. There is no evidence that it attracted his attention in any way, or that it hit him, or came near hitting him. It was not a weapon in the hand of a woman thus thrown, of a very deadly character, or if he had seen it, or known of its being thrown, much calculated to excite an apprehension in his mind that his wife intended to do him some great personal injury or bodily harm. As it does not appear that he knew any thing about it, it is an obvious and natural inference that no such apprehension was excited, or had any existence. Again, this occurrence was at least, according to Mary Driscoll's statement, fifteen minutes before the altercation arose in which he inflicted the fatal wound upon the deceased. During that period he had sufficient time to cool, and, as no renewed attempt was made either by threats or acts to inflict any injury upon him, it is not seen how this circumstance can be invoked to aid the prisoner in establishing the existence of any such apprehension at the time of the homicide. It cannot be contended that any previous apprehensions can afford any justification. It must be an apprehension existing *at the time* the prisoner struck the blow.

It becomes now necessary to examine the particular evidence offered by the counsel for the prisoner and excluded. The prisoner called a witness not present at the time of the homicide, to speak of the general character of the deceased. Good character on the part of the prisoner has always been

admitted, as it tends when established strongly to show that the accused could not have been guilty of the crime charged; and when the testimony is doubtful and uncertain in its nature, such good character is a leading element in establishing the innocence of the party accused. But it is certainly novel in the administration of criminal justice, that the general bad character of the person slain can either tend to show that the party charged is not guilty of the homicide or in any sense mitigate the crime of taking human life. Equality before the law, is a maxim of universal justice; and the life of the humblest and the most abandoned is equally entitled to the protection of the law as that of the most cultivated, refined, or elevated. It is not for man to say which may be taken and which spared.

The defendant's counsel put these questions: Q. Do you know the general character of Mrs. Lamb; that is, whether she was a fighting, vindictive, brutal nature or not? Q. Was Mrs. Lamb of a quarrelsome, vindictive, and brutal character? Q. What was her general character for peace and quietness?

These three questions were severally objected to by the counsel for the people, and the objections sustained, and the counsel for the prisoner excepted, and these exceptions present the only questions arising upon the evidence. It is conceded, that such evidence can only be proper in a case where the evidence shows that there was an assault committed or threatened by the deceased upon the prisoner, and a doubt was created whether the homicide was perpetrated from malice or to repel such assault, and from a principle of self-defense. Now, it has been shown, and it is submitted conclusively, that no such question legitimately arose upon the evidence in this case. The deceased was not shown to have committed any assault upon the prisoner, nor did she threaten to commit any. There was no foundation therefore for the position that the prisoner committed the homicide in self-defense, or from any apprehension of great or any bodily harm.

The testimony could, therefore, have been properly excluded on the ground of its irrelevancy, and I cannot see

that it was admissible upon any principle, upon the facts proven in this trial. The defense set up must be such as the facts developed will sustain, and if no assault upon the prisoner has been committed or threatened, then the defendant's counsel concedes the evidence of character of the deceased is inadmissible. In must be an assault committed or threatened at the time of the homicide, or so immediately preceding it, or so intimately connected with it, as to justify the taking of life in self-defense, or to ward off great, impending and imminent danger of bodily harm. It is unnecessary to recapitulate the evidence to show that no such state of circumstances existed here. That these views are abundantly sustained by text-writers and authority, a reference to some of them will satisfactorily appear. Wharton, in his American Criminal Law (§ 641), thus lays down the doctrine: "On the trial of an indictment for homicide, evidence to prove that the deceased was well known, and understood generally, by the accused and others, to be a quarrelsome, riotous and savage man, is inadmissible. In the eye of the law, to murder the vilest and most abject of the human race, is as great a crime as to murder its greatest benefactor. In one or two cases, however, while the law as above laid down was distinctly recognized, it has been said, that where the killing has been under such circumstances as to create a doubt as to the character of the offense committed, the general character of the deceased may sometimes be drawn in evidence, but the rule undoubtedly is, that the character of the deceased can never be made a matter of controversy, except when involved in the *res gestæ*, for it would be a barbarous thing to allow A to give as a reason for killing B, that B's disposition was savage and riotous." And Wharton, in his American Criminal Law on Homicide (p. 249), says: "It has already been briefly considered how far the character of the deceased for peace and order may be drawn into question, when the defense taken is, that the defendant, from all the circumstances in the case, of which the deceased's character was one, had reason to be in fear of his life. As was then shown, there have been cases

in which courts have been obliged to allow such evidence to
be introduced, and it is easy to imagine cases in the future in
which it would be impossible to exclude it, but as a general
principle the rule continues unbroken, that evidence that the
deceased was riotous, quarrelsome and savage, is inadmissi-
ble, even though such knowledge be brought home to the
defendant himself; any other rule would allow a private
citizen to take upon himself the province of government in
the punishment of crime.

Thus it is seen that as a general principle such evidence is
inadmissible. When admissible, it must be in a case where
the defendant had reason to be in fear of his life, or had rea-
sonable ground to apprehend great bodily harm. Neither
of these essential prerequisites appeared in this case. Again,
it is fundamental to the admission of this class of testimony
in a proper case, that knowledge of the character of the
deceased must be brought home to the knowledge of the
defendant himself. It might be presumed that a man would
know the character of his wife in this respect. Yet, I think
this would not dispense with the rule, that it should affirma-
tively appear that the defendant had such knowledge, before
a foundation can be laid for the introduction of this testi-
mony.

The authorities cited to maintain these propositions are:
*Queensbury* v. *State* (3 Stew. & Porter, 315); *State* v.
*Tuckett* (1 Hawk., 210); *White* v. *State* (9 Yerg., 342); *State*
v. *Jackson* (17 Miss., 544); *State* v. *Tilly* (3 Ired., 424);
*State* v. *Field* (14 Maine, 248); *Coon* v. *York* (9 Metc.,
110); *State* v. *Hawley* (4 Harr., 562); *Coon* v. *Hilliard* (2
Greg., 294); *Oliver* v. *State* (17 Ala., 587); *Coon* v. *Siebert*
(Whart. L. H., pp. 227, 228). To which others may be added,
*Monroe* v. *State* (9 Geo., 85); *Prichett* v. *State* (22 Ala., 39);
*Franklin* v. *State* (29 Ala., 14); *Duke* v. *State* (11 Ind.,
557); *State* v. *Hicks* (27 Mo., 588); *State* v. *Burfield* (8
Ired., 344).

It will be profitable to advert to the facts presented in
some of these cases and the precise point ruled or adjudicated.
In *Monroe* v. *State*, the court, upon the trial of the prisoner

for murder, refused to allow evidence of the violent character of the deceased. LUMPKIN, J., in the opinion of the court, says: " It is further argued that the court erred in rejecting evidence which went to show that the deceased was a violent, rash and bloody-minded man—reckless of human life, etc. As a general rule, it is true that the slayer can derive no advantage from the character of the deceased for violence, provided the killing took place under such circumstances that showed he did not believe himself in danger. Yet in cases of doubt, whether the homicide was perpetrated in malice or from a principle of self-preservation, it is proper to admit any testimony calculated to illustrate to the jury the motive by which the prisoner was actuated, and in this view we think the evidence was improperly ruled out. Reasonable fear, under our Code, repels the conclusion of malice; and has not the character of the deceased for violence much to do in determining the reasonableness or unreasonableness of the fear under which the defendant claims to have acted ? "

In *Prichett* v. *State* (22 Ala., 39) the prisoner was indicted for murder. The court held that inasmuch as defendant had not been assaulted, and the killing of deceased by him would be murder, on the testimony, however bad might have been the character of the deceased, the court below properly excluded all evidence on that subject. CHILTON, Ch. J., in the opinion of the court, says: " But however bad or desperate the character of the deceased may be, and however many threats such person may have made, he forfeits no right to his life, until, by an actual attempt to execute his threats, or by some act or demonstration *at the time of killing*, taken in connection with such character or threats, he induces a reasonable belief on the part of the slayer that it is necessary to deprive him of life in order to save his own, or to prevent some felony upon his person."

In *Franklin* v. *State*, the court, per WALKER, J., says: "Whenever such bad character on the part of the deceased thus illustrates the circumstances attending a homicide, and the circumstances so illustrated tend to produce a reasonable belief of imminent danger in the mind of the slayer, the

character, as mingled with the transaction, is a part of it, and is indispensable to its correct understanding. * * * When the conduct of the deceased although in itself innocent, is such that, illustrated by his character, its tendency is to excite a reasonable belief of imminent peril, the evidence ought to be admitted, and the question of its effect left to the determination of the jury.

In *Coon* v. *Siebert* (*supra*), Judge CORNINGHAM said to the jury : " You may inquire, too, whether the deceased, making, as is contended, the first assault, was bold, strong and of a violent and vindictive character, and the defendant much weaker and of a timid disposition, and how far their power was equalized by weapons in the hands of the latter. * * * In the assault of a strong man upon a boy or a female, of a powerful individual upon a weaker one, the necessity of taking life in self-defense, under an ordinary attack, will be more easily discoverable than in an attack by one man upon another under more equal circumstances."

In *Duke* v. *State* (*supra*), the court, per PERKINS, J., says : " As a general rule, it is the character of the living — the defendant on trial for the commission of crime and not of the person on whom the crime was committed—that is in issue, and as to which therefore the evidence is admissible."

In *State* v. *Hicks* (*supra*), the court, per RICHARDSON, J., says : " If the defendant killed Mills under circumstances that showed he did not have reasonable cause to apprehend immediate danger of violence to himself, he cannot defend himself on the ground of the vicious character of the deceased, for the law provides the same protection to the persons of all men, and it is as great a crime in the eye of the law to kill, without cause, a bad man as a good one."

In *Wright* v. *State* (*supra*), the prisoner was indicted for stabbing Underwood, a free man of color. Upon the trial, the defendant's counsel offered to prove that Underwood, the prosecutor, was a turbulent, violent, saucy fellow. There was no proof in that case that he had assaulted the prisoner. The Supreme Court, per TURLEY, J., says : " The second cause assigned as error, is that the court refused to hear

proof to show that the prosecutor, Underwood, who is a free man of color, was a turbulent, insolent, saucy fellow. We think there was no error in this; for, supposing him to have been of the character described, we cannot see how this would have extenuated the offense of stabbing him."

In *State* v. *Tilley* (*supra*), the prisoner was indicted for the murder of one William G. Martin. There was no evidence on the trial showing, or tending to show, that the prisoner had been assaulted by the deceased, and in this particular the case is identical with that at bar. The prisoner's counsel proposed to inquire of one of the witnesses "whether the deceased did not bear the character of being high-tempered, overbearing and oppressive toward his overseers and tenants," but the question was objected to and excluded, and the ruling sustained. And the same doctrine was affirmed in the case of the *State* v. *Benfield* (8 Ired., 344). The prisoner was not assaulted by the deceased, nor was deceased guilty of any acts of violence whatever. The counsel for the prisoner then offered to prove, by a witness who had formerly lived with the deceased, that his general character was that of a violent, overbearing and quarrelsome man, and that such were his domestic habits. On objection made on the part of the State, the court rejected the evidence. This ruling was sustained. RUFFIN, Ch. J., said "The law no more allows a man of bad temper and habits of violence to be killed by another, whom he is not assaulting, than it does the most peaceable and quiet of men. * * * No such principle or decision is found as that a person may kill another because, from his former course of life as a fighter, he apprehends an assault from him, though it be even a violent one. * * * It is the fact and not the fear of an assault that extenuates the killing, upon the supposition that it instantly rouses the resentment to an uncontrollable pitch." *Tuckett's case*, in 1 Hawkes, the chief justice says, is the only instance in which, even in a case of circumstantial evidence, it was allowed.

In *State* v. *Jackson* (*supra*), the prisoner was indicted "for feloniously assaulting and shooting one Jonathan Millsap, with intent to kill him."

The testimony showed that the deceased did not assault or attempt to assault the prisoner. The prisoner, at a distance of thirty yards from the deceased, shot him, the latter being unarmed. The court excluded the evidence. The Supreme Court sustained this ruling. RYLAND, J., in the opinion, said, "As to the character of the man shot (that is, Millsap) for danger and desperation, it was properly excluded from the jury. There may be cases where the general character would be proper evidence before the jury; it would explain the situation of the parties, and their acts and deeds at the time." In *Oliver* v. *State* (*supra*) the prisoner was indicted for the murder of one William E. Hammond. The court held, " that whether the circumstances are such as to create a reasonable belief, in the mind of the slayer, that a necessity exists for taking the life of another, is a question for the jury, in the solution of which they may consider the condition of both parties."

*In State* v. *Hawley* (4 Harring., 562), BOOTH, Ch. J., says: "The testimony offered is the general character of the deceased as a violent man. From the fact, that we cannot find any case in the books where this evidence has been admitted, nor any principle which would admit it, we feel constrained to reject the evidence. We do not see how the character of the deceased as a quarrelsome or fighting man is in issue. The question is, guilty or not guilty of murder. The homicide being made out, it lies on the defendant to reduce the offense below the grade of murder, and he must do this by evidence of facts and not by the mere general bad character of the deceased."

*Commonwealth* v. *Hilliard* (2 Gray, 294) was a trial before Chief Justice SHAW, and Judges METCALF and BIGELOW. On the trial of the defendant for murder, there was evidence tending to prove an assault by the deceased upon the defendant, immediately before the striking of the mortal blow. And the defendant offered in evidence, that the general character and habits of the deceased were those of a quarrelsome, fighting, vindictive and brutal man of great strength, as a circumstance tending to show the nature of

the provocation under which the defendant acted, and that he had reasonable cause to fear great bodily harm.   Clifford, objecting, cited *York's case* (7 Law, 507, 509).   By the court:   " The evidence is inadmissible.   If such evidence were admitted · on behalf of the prisoner, it would be competent for the commonwealth to show that the deceased was of a mild and peaceable character.   Such evidence is too remote and uncertain to have any legitimate bearing on the question at issue.   The provocation under which the defendant acted must be judged of by the *res gestæ*, and the evidence must be confined to the facts and circumstances attending the assault by the deceased upon the defendant."

In *York's case*, the counsel for the prisoner asked leave to introduce evidence to the effect that the deceased was a man of notoriously quarrelsome and fighting habits, and boasted of his powers as a fighter.  This was objected to as irrelevant, and the court sustained the objection.   Chief Justice SHAW, in pronouncing the opinion of the court, said: The rule unquestionably, is, that the general character of neither party can be shown in evidence on trials for homicide.   The prisoner has the personal privilege of showing his good character, but unless he puts it in issue, it is not so.   The government cannot prove either quarrelsome habits in the prisoner or peaceable habits in the deceased.   There is no limit if we go beyond the *res gestæ*.   *   *   *   The cases from Hawkes, and from Stewart & Porter, stand alone, and are not of such authority as to require us to leave the established course of practice. (See also Cowen & Hill's Notes to Phillipps on Evidence, 764, note 205.)

I think these cases abundantly and satisfactorily show that the ruling upon the trial in this case, excluding the testimony offered, was correct.   Indeed, I have not met with a case where such evidence was offered and insisted on, when it did not distinctly appear that the deceased had assaulted the prisoner, and when that fact thus appeared, then the evidence is admitted upon the principle that it tends to rebut the presumption of malice, or that the killing was in self-defense, or under the reasonable apprehension of great bodily harm.

But on the facts proven in this case, the principle contended for has no application. There was no error in the statement of the judge to the jury that the law presumes malice from the mere act of killing, because the natural and probable consequences of any deliberate act are presumed to have been intended by the author. The judge had just read the statutory definitions of murder, and the law implies malice when the killing is premeditated or deliberate. The jury could not have been misled by this remark of the judge. It is claimed also on behalf of the prisoner that the court erred in its charge when he said to the jury: "It is not his impressions alone, but the question is whether those impressions, at the time he formed them, were correct. If they were correct, it is a protection. If they were incorrect, then it affords him no immunity or protection." It is well to see in what connection this language was used. The judge immediately preceding and in this connection had said: "The other principle of the law is that a man is not bound, if his life is in imminent peril or danger, to await until he receives a fatal wound, or has some great bodily injury inflicted on him. If he thinks his life is in imminent peril, he has a right to act upon that thought and take life; but if he does it, gentlemen, it is at the risk of a jury saying, when all the facts were developed before them, whether he was justified in forming that opinion or not. If you are satisfied from the evidence that the circumstances did not warrant the conclusion he arrived at, and that he took life, it is no justification and you have a right to convict." Then follows the sentences objected to, already quoted. It is seen, on an examination of them, that they are only an amplification or illustration of the previous remarks. He had already told them that his justification did not consist in the fact that he came to the conclusion that his life was in danger, but that the jury must be satisfied that he was justified in forming that conclusion from the facts before him. And he, therefore, in further illustration, told them that impressions alone were not a justification, but those impressions must have facts for their basis; such facts as would warrant or authorize him in forming or entertaining

these impressions; in other words, the impressions must be correct. If the impressions *alone* of a criminal, that his life was in danger, when such impressions are not reasonable, and have no facts for a foundation, are an immunity for taking life, it is not difficult to see that every prisoner will have such an impression; if that *alone* is an immunity, it will be easy in all cases to be availed of.

This portion of the charge is in conformity with the rules as laid down by BRONSON, J., in this court, in the case of *Shorter* v. *The People* (2 Comst., 193). The prisoner in that case was indicted and convicted of the crime of murder. In that case the deceased gave the first blow. The deceased had no weapon, and struck with his naked hands. The prisoner had a knife with which he inflicted one or more mortal wounds. And Judge BRONSON truly said: "Where a man is struck with the naked hand, and he has no reason to apprehend a design to do him any bodily harm, he must not return the blow with a dangerous weapon. After a conflict has commenced he must quit it, if he can do so in safety, before he kills his adversary; and I hardly need add that if his adversary try to escape he must not pursue and give him fatal blows with a deadly weapon." But upon the precise point now under consideration, Judge BRONSON says: "Where one who is without fault himself is attacked by another in such a manner, or under such circumstances, as to furnish reasonable ground for apprehending a design to take away his life, or do him some great bodily harm, and there is reasonable ground for believing the danger imminent that such design will be accomplished, I think he may safely act upon appearances, and kill the assailant if that be necessary to avoid the apprehended danger; and the killing will be justifiable, although it may afterward turn out that the appearances were false, and there was in fact neither design to do him serious injury nor danger that it would be done. *He must decide* at his peril upon the force of the circumstances in which he is placed, for that is a matter which will be subject to judicial review. * * And again he says: "It is not enough that the party believed himself in danger,

unless the facts and circumstances were such that the jury can say that he had reasonable grounds for his belief."

In the views of the facts proven on the trial of this case, the charge of the judge was far more favorable to the prisoner, than the doctrine enunciated by this court in Shorter's case would warrant. Here the judge told the jury that the impressions alone were not sufficient. In Shorter's case we said it was not enough that the party even believed he was in danger. His justification must turn upon this: were the facts and circumstances such, that the jury could say he had reasonable grounds for his belief? He must decide at his peril upon the force of the circumstances in which he is placed, for his decision must be subject to judicial review. The judge therefore committed no error in this portion of his charge, and if the portion of the charge now criticised was subject to exception every thing objectionable in it was removed by the judge charging as requested in the third proposition of defendant's counsel. He certainly then explained what he understood by the language used.

Notwithstanding my opinion that no injustice has been done to the prisoner by any of the rulings upon his trial, or any proceedings therein, I nevertheless concur with my brethren that, under the peculiar circumstances of this case, and in view of the provisions of the special statute, applicable to appeals in capital cases tried in the New York General Sessions (Laws of 1855, p. 613, § 3), the prisoner should have another trial.

SMITH, J. The testimony in this case, carefully considered, does not, in any view, warrant the defendant's assumption that the killing of his wife was justifiable as a lawful and necessary act of self-defense. To maintain such claim, it was essential to show: First, that the defendant himself was acting in no wise against law, in the encounter which resulted in the homicide; second, that at the time of giving the fatal blow, he had reasonable ground to apprehend a design to do him some great personal injury; and, third, that he also had reasonable ground to believe that there was

imminent danger of such design being accomplished. (2 R. S., 680, § 3, sub. 2; *The People* v. *Shorter*, 2 Comst., 193; *The People* v. *Sullivan*, 3 Seld., 396.)

The defense failed in each of these particulars. According to the testimony of Mary Driscoll, the only witness relied upon by the defendant to prove his plea of self-defense, the defendant was the aggressor in the final encounter which terminated in the homicide. His wife had previously hit him on the hands with a poker, and had flung the lid of an iron kettle after him at the door. He stood near the door about fifteen minutes after the missile was thrown, and then advanced upon his wife and struck her with his fist. Soon afterward she pulled his chair from under him, and he then knocked her down with a stick of wood, and she getting up, they had a scuffle, in which he inflicted the wound of which she died. The deceased had no weapon after she discharged the iron lid, and there were no facts or appearances justifying the belief that she designed to do him a great personal injury, and that the danger of the accomplishment of such design was imminent. If he believed she designed to attack him and do him such injury, he had ample opportunity to avoid the attack, and it was his duty to do so. His right of attack for the purpose of defense did not arise until he had done every thing in his power to avoid its necessity. (*People* v. *Sullivan, supra.*)

The instruction given by the judge to the jury, on the subject of justifiable homicide, was, therefore, an abstract proposition, and even if it was erroneous, it did not prejudice the defendant.

But viewing the portion of the charge relating to that subject, as a whole, and not in detached fragments, it is by no means clear that it was erroneous. The judge said: "A man is not bound, if his life is in imminent peril, to wait till he receives some great bodily injury. If he thinks his life is in imminent peril, he has a right to act upon that thought, and take life; but if he does it, it is at the risk of a jury saying, when all the facts are developed before them, whether he was justified in forming that opinion or not. If the jury

are satisfied from the evidence that the circumstances did not warrant the conclusion that he arrived at, and that he took life, it is no justification, and they have a right to convict." Thus far, the charge was quite unexceptionable. The judge said further (and this is what is excepted to): "It is not his impressions alone, but the question is whether those impressions at the time he formed them were correct." If correct, they are a protection, otherwise not. By fair construction the term "correct impressions" thus used is to be read in the light of the preceding portion of the charge above cited, and it means simply "impressions warranted by the circumstances," under which the defendant acted at the time of the homicide. It would be putting a forced and narrow construction upon the charge to say that it was intended by the court or understood by the jury, to exclude impressions based upon appearances, which were afterward shown to be false.

The fact that there was no evidence in support of the plea that the homicide was justifiable, was also a sufficient ground for rejecting the offer of the defendant's counsel to show that the deceased was of a quarrelsome, vindictive and brutal disposition. The authorities cited by the defendant's counsel show that testimony of that nature has been received only in cases where the killing took place under circumstances that afforded the slayer reasonable grounds to believe himself in peril, and then solely for the purpose of illustrating to the jury the motive which actuated him. (Whart. Am. Crim. Law, § 641, 4th ed.; Whart. on Homicide, p. 249, and cases there cited.)

When the offer was made in the case, the witness Driscoll had not been examined, and after her testimony was given the offer was not renewed.

Besides, testimony substantially of the character of that offered, was allowed to come in, inadvertently or otherwise, in the course of the trial, so that the defendant was not prejudiced by the rejection of the offer.

But there is another branch of the case in respect to which I think the court erred. It became a question upon the

evidence, whether the homicide was perpetrated with a pre-meditated design to effect death, or without such design and in a heat of passion. If the former hypothesis was the true one the homicide was murder, if the latter it was one of the degrees of manslaughter.

If the nature of the homicidal act itself furnished presump-tive evidence of a deadly intent, the jury was authorized to find that such presumption was overcome by the testimony of Mary Driscoll, provided they thought her testimony entitled to credit.

The only evidence of a premeditated design to effect death, aside from the criminal act itself, was the testimony of Ann Kennedy that she saw the prisoner at the door rubbing a knife on a board, and the testimony of the little girl, the daughter of the deceased, that when Lamb approached her mother, just before he stabbed her, he said to her " I will hang for you."

The daughter was but eight years old at the time of the trial. The witness, Ann Kennedy, was grossly intoxicated with liquor immediately after the killing, according to the testimony of the policeman, O'Day, a witness for the prose-cution; so much so that the jury would have been warranted in saying that she was incapable of appreciating or recollect-ing what occurred at the time of the homicide.

Neither of these witnesses was corroborated in respect to the foregoing particulars of their testimony.

It appeared by the medical testimony introduced by the prosecution, that the wound was on the left side of the neck, that its depth was about half the length of the blade of the pen-knife shown in court, as the weapon used, and that it entered an artery which none but a physician would be likely to find, except by accident. It was thus very doubt-ful, on the whole evidence, whether the crime was of a higher grade than manslaughter.

On this state of the testimony, the defendant gave evi-dence of his general good character, and it was not contra-dicted. It was an important item of evidence, and the defendant was entitled to the full benefit of it. The court

charged the jury in respect to it as follows: " Good character, as all judges have charged juries, is a shield and protection where it is offered in doubtful cases, because it repels the presumption of guilt, but in a clear case it affords no protection. Yet, it is for you to say how far and what degree of weight you will give to that testimony. * * * If you think it entitled to any weight, you can regard it; if you do not you can reject it." ·

In so far as the charge left it to the *discretion* of the jury to utterly disregard the uncontradicted evidence of the defendant's good character (and it seems to have done so unqualifiedly), it was erroneous and prejudicial to the defendant. The true rule is, that such evidence must, in any event, be considered by the jury, together with the other facts and circumstances of the case; it is not merely of value in doubtful cases, but will, óf itself, sometimes create a doubt where none could exist without it; and if good character be proved to the satisfaction of the jury, it should turn the scale in favor of the defendant, even in cases where, without it, the whole evidence would slightly preponderate against him. (*Stephens* v. *The People*, 4 P. C. R., 396; *Cancemi* v. *The People*, 16 N. Y., 501; 2 Russ. on Crimes, 785, 786.)

This inaccurate instruction was the more damaging to the defendant in consequence of some other features of the charge relating to the question whether the crime proved was murder or manslaughter.

The judge read the statutes defining those offenses, and then said : " You will perceive, gentlemen, that our law has made provision for almost every circumstance connected with homicide, reducing it down, and, in point of fact, leaving it purely to the discretion of the jury, where there are doubts." At the close of the charge, the counsel for the defendant, evidently apprehensive that this language would be understood by the jury as an instruction that if they were in doubt as to the grade of the offense proved, they could convict of either in their discretion, asked the court to charge " that if the jury have a reasonable doubt from the

evidence as to what degree of guilt to convict of, it is their
duty to convict of the lesser degree." In reply the court
said to the jury: "That is a matter purely for your deter-
mination. If you are not satisfied that he intended the act,
as I said before, you can find him guilty of either of the
lesser degrees." Now the rule which the defendant's counsel
asked to have submitted to the jury was strictly correct, and
applicable to the evidence in this case. (3 Gray, 463–66;
Wharton's Am. Crim. Law, § 710, 5th ed.) It would, perhaps,
be hypercritical to say that the charge was not intended to
comply with the request, but it certainly lacked that degree
of clearness and precision with which it is desirable that
controlling rules of law should be laid down to the jury,
especially in capital cases.

Again, the judge charged the jury that the law presumes
malice from the mere act of killing. The proposition is
true, in the abstract, and is strictly applicable to a case
where the killing is proved to have been done by the defend-
ant, and *nothing further is shown;* but where circumstances
of accident, necessity, or infirmity appear, all the evidence
which the jury find true is to be considered, and, no excuse
or justification being shown, if the jury are satisfied beyond
a reasonable doubt that the homicide was perpetrated with
malice, it is their duty to return a verdict of murder, other-
wise of manslaughter. In this case the rule was stated
without its qualification.

Lastly, the testimony of the little girl and that of Ann
Kennedy, although admissible, were to be received with very
great caution, owing to the circumstances above adverted to,
yet their statements were distinctly presented by the court
to the jury as evidence to be considered in determining
whether the defendant acted with a premeditated design to
effect death, but no instruction was given as to the unusual
degree of caution with which the testimony should be
scrutinized and weighed.

These several features of the charge, although perhaps not
amounting to errors, for which a new trial would be granted
in ordinary cases, were unfortunately calculated to confirm

the wrong impression which the erroneous ruling in respect to the evidence of good character inevitably produced in the minds of the jury.

Under the provisions of the special statute, which gives us a peculiar jurisdiction in this case (Laws 1855, p. 613, ch. 537, § 3), I think the defendant is entitled to a new trial.

I am therefore of opinion that the judgment of the Supreme Court, setting aside the conviction and ordering a new trial, should be affirmed, and that the record, with the judgment of this court, should be remitted to the Court of General Sessions of the city and county of New York, to proceed therein.

MORGAN, J.   There was evidence, if the jury believed the little girl, to convict the prisoner of murder in the first degree.   If he deliberated and declared his intention to kill his wife and followed it up with a fatal blow, he was guilty of murder in the first degree, according to all the authorities. The prisoner had a fair trial so far as the evidence is concerned, and the charge of the judge was in the main unexceptionable.   The objection as to what he said in relation to the impressions of the prisoner as to whether he or the jury was to estimate the magnitude of the danger which would justify him in killing his wife in self-defense, was quite foreign to the case in hand, for there was really no evidence which would have authorized the jury to find that the prisoner committed the act in self-defense.   But I will observe that if the case was one where a question could fairly arise, the jury are to judge whether the prisoner was in such apparent danger as to cause him to believe it was necessary to kill his adversary in self-defense.   It is not enough for the prisoner to say he believed it ; he is not even a witness for any such purpose ; but it is for the jury to determine whether or not the prisoner had a right to believe it.   This belief may be founded only upon appearances, when there is no real foundation for such an apprehension. Although the judge seemed to have been unfortunate in selecting the proper expressions to define the rule of law

in this respect, I think his charge is not liable to be misinterpreted by the jury to the prejudice of the prisoner. Indeed, I cannot, as I have already observed, see any evidence upon which such a question could fairly arise. And as such a question could not arise upon any theory of the evidence, it was not material to go back and inquire what had been the character of Mrs. Lamb, except so far as to show that she was quarrelsome and abusive toward her husband on this particular occasion. The judge was sufficiently liberal toward the prisoner in the reception of this species of evidence.

But in my opinion the charge was calculated to mislead the jury in respect to the crime of which the jury might have convicted the prisoner upon the evidence.

While there was no ground for believing that the prisoner did the act in self-defense, the jury might have convicted him of murder in the second degree, or perhaps of manslaughter in the third degree. This would depend upon the view the jury took of the evidence. The witnesses who witnessed the transaction were of very doubtful character, and their testimony is quite contradictory and irreconcilable as to what took place immediately preceding the fatal blow. It would appear that not only the witnesses who saw the transaction, but both the prisoner and his victim, were more or less intoxicated. The jury might believe and could hardly doubt that the prisoner formed a design to kill his wife, if they credited the testimony of the little girl; or they might have come to the same conclusion upon the testimony of the other witnesses. They might however have believed, upon the whole case, that the prisoner, in a state of intoxication, while in a fierce scuffle with his wife, who was a strong, powerful woman, struck the fatal blow in a paroxysm of anger growing out of the excitement of the occasion, without any previous intention to take her life; or perhaps that he did not intend to kill her when he stabbed her with his pocket knife.

Under the statutes of this State, as amended in 1862 (2 R. S. 65 ; Laws of 1862, p. 368), the prisoner might have been

convicted of murder in the first or second degree, or of man-slaughter in the third degree, depending upon the facts or circumstances as they should be found to exist at the time of the homicide.

The amendment, dividing the crime of murder into two degrees, must be construed in such a way as to give effect to the intention of the legislature, even if it requires a modification of the rules of law which have been established by the decisions of the court, to define what constituted murder within the meaning of the statute, before the amendment. In *The People* v. *Clark* (3 Seld., 389), the charge of the judge was, "that if the jury believed that the killing was produced by the prisoner with an intention to kill, though that intention was formed at the instant of striking the fatal blow, it was murder. JOHNSON, J., in delivering the opinion of the court, observed, that "it is enough that the intention precedes the act, although that follows instantly." (p. 394.)

Judges, who were in the habit of presiding upon criminal trials, have had occasion to regret the existence of such a rigid rule of construction, which not unfrequently induced the jury to acquit the prisoner altogether rather than to convict the prisoner of a capital offense. Where there is no premeditation, as that term is usually understood in common parlance, and where there are extenuating circumstances which satisfy the jury that the prisoner, if he had taken a moment's time for deliberation, would not have committed the act, the law now, as I understand it, will authorize the jury to convict the prisoner of murder in the second degree. Doubtless it is utterly impracticable to define with exactness the distinction between murder in the first and second degrees, as much must be left to the discretion and good sense of the jury. Whatever technical rules courts may lay down, jurors will make a distinction in cases of homicide between those that are perpetrated with a premeditated design and those which are perpetrated in a paroxysm of anger arising out of the circumstances of the occasion, when the intention accompanies the act, and does not, in the common acceptation of the word, precede it. It is not strictly

true that an intention which arises in a paroxysm of anger and accompanies the fatal blow, can be said to have been formed upon deliberation. Deliberation requires time, and whether the time is long enough to make the act one of deliberation, should be left to the jury, under instructions that they may find the prisoner guilty in the first or second degree, depending upon the view they take of the prisoner's state of mind at the time of the homicide.

It may not be thought inappropriate to call to our aid the decisions of the courts of other States, in which the crime of murder is divided into two degrees by substantially the same language as is used in the amendment of 1862 to define that crime in this State. In Virginia, by 1st Revised Code, p. 116, the legislature enumerated particular cases which constituted murder in the first degree, including also *willful, deliberate,* or *premeditated killing;* and then declares that "all other kinds of murder shall be deemed murder in the second degree."

In *Jones'* case (1 Leigh, 598), the distinction between murder in the first and second degree was noticed. To constitute murder in the first degree, the judge thought proof must be adduced to satisfy the mind that the death of the party slain was the ultimate result which the concurring will, deliberation and premeditation of the party accused sought. (p. 611.) In that case the prisoner was adjudged guilty of murder in the first degree, because he employed his time, not in hasty, but in deliberate preparation to execute the purpose he had avowed of shedding the blood of the deceased. (p. 613.) In *Whitford* v. *The Commonwealth* (6 Rand., 725), the court say : "There are many instances in which the act would not be considered so willful, deliberate and premeditated as to make it murder in the first degree, yet it would be murder at common law, and therefore, by the statute, would be considered as murder in the second degree.

In *Hill's case* (2 Gratt., 594), the court held that, under the statute of Virginia, "every homicide is *prima facie* murder in the second degree; and, in order to elevate the offense to murder in the first degree, the burden is cast upon the com-

monwealth to bring it by proof, either within the specified class of cases, such as killing by poison, or by lying in wait, etc., enumerated in the statute or within the general class of willful, deliberate or premeditated killing. And, "on the other hand, in order to reduce the offense from murder in the second degree to manslaughter, the burden is cast upon the accused." (p. 598.)

In Tennessee the same distinction exists between murder in the first and second degrees; and it has been decided in that State that the statute makes the nature and essence of the crime to depend on the peculiar state or condition of the criminal's mind at the time, and with reference to the act done; and, in this view, drunkenness may be a proper subject for the consideration of the jury, not to excuse or mitigate the offense, but to show that it was not committed; that the chief ingredient of the offense of murder in the first degree consists in a deliberately formed design to take life; that, "though voluntary drunkenness cannot excuse from the commission of crime, yet when, as upon a charge of murder, the material question is, whether the act was premeditated, or done only with sudden heat and impulse, the fact of the party being intoxicated has been held to be a circumstance proper to be taken under consideration." (Id., p. 142, citing *The King* v. *Grindly*, 1 Russell on Crimes, 83; to which I will add 8 Greenleaf on Ev., § 148; *Reg.* v. *Cruine*, 8 C. & P., 546, Pattison, J.; and *State* v. *M. Coats*, 1 Spears, 384.)

In *Mitchell* v. *The State* (5 Yerg., 340), the judge, on the trial, told the jury that "the fact of killing being proved, the law presumed that it was malicious, and that it was incumbent on the defendant to show, by proof, matter in alleviation, or that it was a less offense than murder." This instruction was not complained of. But the judge omitted to state to the jury the distinction between murder in the first degree and murder in the second degree. (p. 342.) Catron, Ch. J., thought, although the judge in strictness ought to have explained the distinction, that his omission to do so was not error. Green, J., admitted that the charge was correct, so

far as it goes; but it was his opinion that under the statute the court ought to have particularly explained the difference to the jury; and, because it was not done, he concurred in reversing the judgment. And in that opinion was PECK, J., who observed, that in all cases of murder, "the attention of the jury should be called to this very material distinction arising on the character of malice with which the act was accompanied."

In *Dale* v. *The State* (10 Yerg., 551), the court defined the distinction between the two degrees of murder substantially the same as it was announced in the Virginia cases. And to the same purport are the decisions in Pennsylvania, where the statute makes the same distinction between murder in the first and second degrees.

THOMPSON, J., in *Kelly* v. *The Commonwealth* (1 Grant's Cases, 492), says: "More is necessary than a blow with an instrument likely to kill, to constitute murder in the first degree; there must be *intention, deliberation* and *premeditation found;* and the instrument is evidence on this point. If this do not appear, the use of the instrument in a sudden quarrel, although likely to kill, and killing ensues, leaves the grade of the crime in the second degree."

In my opinion, our statute, as amended in 1862, requires the courts of this State to adopt a construction in accordance with the uniform decisions in those States where the offense is described in similar language, and by equivalent terms.

In the case at bar, the judge charged the jury, that if they believed from the evidence the prisoner "intended to take the life of the deceased," their verdict should be that of murder; but if they believed "he did not intend to take her life," they might convict him of either murder in the second degree, or of some of the degrees of manslaughter."

Instead of mitigating the crime of murder by reducing one species of it to murder in the second degree, the charge in effect raises the crime of manslaughter to murder in the second degree. If the prisoner did not intend to take life, he was not guilty of murder in either degree, but only of. manslaughter; for I suppose it will be admitted that there

must be an intention to take the life of the deceased in this class of cases to constitute murder in the second degree.

In my opinion the judge erred in his charge on this point, and failed to point out the correct distinction between murder in the first degree and murder in the second degree. I have already referred to the authorities which point out the difference; and I think it was the duty of the judge to instruct the jury, that to constitute murder in the first degree, they must find, not only that the prisoner designed to kill his victim, but that it was a premeditated design, and that, if there was no premeditation, the offense was, by our statute, reduced to the crime of murder in the second degree. A charge, that a design to take life constitutes murder in the first degree, is not the statutory definition of murder in the first degree; but the adoption of a technical rule in place of it, founded upon some extreme case in the court, the doctrine of which it was the design of the legislature to modify by the amendment of 1862. It is the duty of the judge to give the prisoner the benefit of this modification, without undertaking to ignore it by a charge which leaves the jury no discretion, but requires them to find the prisoner guilty of murder in the first degree, or of manslaughter.

Although we may think the case was one which would justify the verdict of murder in the first degree, we cannot say that the jury might not have taken a different view of it, one which would have led to a verdict of murder in the second degree, under proper instructions. For this reason I think the judgment should be affirmed, and a new trial granted.

A majority of the court affirm, but upon different grounds.