## THE PEOPLE v. GEORGE COOK.

*Homicide—Proximate cause of death—Killing in defense of chastity—Threats—Mistake of law does not excuse homicide.*

Where a fatal wound has been given it is no defense that death, when it took place, was precipitated by medical treatment.

Homicide in defense of a woman's chastity, is not justified by a belief that the deceased had been using fraudulent, but not forcible means, as by administering drugs, to effect a seduction not accomplished at the time of the killing.

Facts which the respondent in a case of homicide did not know until afterwards are not admissible to justify the killing; but they may be admissible to strengthen other evidence tending to show that it was done in defense of life or person.

Threats will not excuse a homicide where the respondent could not reasonably have supposed that the killing was necessary to prevent forcible felony.

A mistake of law as to one's right to take life will not justify or excuse homicide.

Exceptions before judgment from Washtenaw. Submitted June 19. Decided October 9.

MURDER. Respondent was convicted of manslaughter.

Attorney General *Otto Kirchner* for the People.

*A. J. Sawyer* for respondent. A reasonable doubt as to the cause of the death should acquit one charged with murder, *Brown v. State*, 38 Tex., 482; *State v. Scott*, 12 La. Ann., 274; the benefit of the doubt as to whether a homicide is justifiable should be given to the accused, *People v. Arnold*, 15 Cal., 476; *State v. Ellick*, 1 Winst. (N. C.), 56; *State v. McCluer*, 5 Nev., 132; *Gladden v. State*, 13 Fla., 623.

MARSTON, J. The respondent was tried upon an information charging him with having committed the crime of murder and was convicted of manslaughter. The case comes here upon exceptions before sentence.

The shooting of the deceased by respondent was not denied on the trial. The defense relied on was:

*First.* That the death was actually caused by morphine poisoning before the wound had so far affected vitality as to induce a belief that it was or could have been the cause of death;

*Second.* Justifiable homicide, committed in order to prevent the abduction and seduction of respondent's sister by the deceased; and

*Third.* Insanity.

The errors assigned all range and may appropriately be considered under these three divisions.

*First.* As to death by poisoning. The position taken upon this branch of the case is clearly and strongly stated by counsel in his brief as follows:

" One ground of the defense was that the deceased did not come to his death by the hand of the defendant; that before there was time to determine whether the wound inflicted by the defendant was mortal or not, deceased was killed outright by morphine administered by hands other than defendant's. Not that death was caused by negligent or unskillful treatment of the wound, but that the medicine administered produced death independently of the wound, and would have produced the same results upon the same person if administered in the same manner, even though he had not been wounded at all."

Upon this theory the court was requested to charge:

"8th. If the jury shall believe that the death was caused by morphine poisoning, or if from the whole testimony they have a reasonable doubt as to what was the cause of death, they must acquit.

"9th. If the jury shall believe that the injury inflicted by the prisoner would have been fatal, but that death was actually produced by morphine poisoning, they must acquit the defendant."

These requests with others were presented in writing to the court, who endorsed thereon a refusal except as given in the body of the charge. Turning to this portion of the charge as given, the instructions were as follows:

"First, as to the character of the injury and the cause of the death. This is a question which properly may and possibly will first receive your attention in the natural order of things, and in respect to which I say to you, in accordance with the defendant's request, that in order to convict you should be able from the evidence to trace death to the injury inflicted by the defendant, and that too beyond a reasonable doubt, which I will explain more fully hereafter. [But if the gunshot wound was in itself mortal or reasonably calculated from its nature and extent to produce death, it would be no defense that the deceased, under better or different medical treatment, might have recovered; nor will the law justify a verdict of not guilty merely upon the ground that the medicines administered to restore or relieve the deceased, in point of truth, did co-operate with the wound in producing death. It would be enough if the gunshot wound contributed mediately or immediately to the death, but on the other hand, if the gunshot injury was not a mortal one in itself, nor reasonably calculated to produce death from its nature and extent, and death ensued, not from it, but solely from morphine poisoning, to which the injury did not materially contribute, the defendant could not in that case, be convicted]. It is, of course, for you to determine all questions of fact upon this as upon any other branch of the case. [It is for you to determine the nature and extent of the wound, whether mortal in itself, or whether reasonably calculated to produce death; if not, what was the cause of death; did it result directly from the medicine? Was that the sole and direct cause of death, or did it (the morphine) merely co-operate with the injury to produce and hasten fatal results?] These are questions for you to determine, and you are to dispose of this branch of the case upon these instructions and such evidence as has been given to you. I can give you no further aid upon this branch of the case."

It will thus be seen that the law was correctly and clearly laid down by the court in accordance with the authorities, and that it clearly covered the defendant's eighth request.

The ninth request was not given. This request was based upon a theory that where a mortal wound has been given, but the death is actually produced by morphine administered by the hand of another, there must be an acquittal. *The State v. Scates*, 5 Jones (N.

C.), 420, was relied upon as an authority in support of this proposition. In that case the jury was charged that if one person inflicts a mortal wound, and before the assailed person dies, another person kills him by an independent act, the former is guilty of murder, and this was held error.

This case does not, however, come within the principle of that case. Here a mortal wound was given. Physicians were called in who prescribed for and treated the wounded man. Morphine was administered, and it is claimed in such unreasonably large quantities that it caused death. It was not claimed that these physicians were deficient in medical skill, or that morphine in proper quantities, and at proper times, should not have been administered, or that the deceased could under any treatment, or in the absence of all treatment, have survived. Admitting the correctness of the authority relied upon, what application can such a rule have to cases like the present? If death was actually produced by morphine, can it be said in view of the facts, "that another person killed the deceased by an independent act?" Here morphine was administered as a medicine by competent and skillful physicians; it was a proper and appropriate medicine to be given. Was it the independent act of the physicians who prescribed, or of the nurses who administered the morphine? Was it the mortal wound likely to cause death at any moment, or an undue quantity of medicine, unskillfully but honestly given to alleviate suffering, which actually caused death? Were the last powders, which constituted the over-dose, given during the dying man's last moments, or so recently before death that they could not have caused it or materially contributed thereto? How under the conflicting theories and uncertainties, which would inevitably arise in such a case, could it be said which was the real cause? Could it be made to appear with clearness and certainty that not the wound, but the medicines administered, were the sole cause of the death?

There are authorities which hold that the burthen of so proving would rest upon the accused, in cases where the wound was not a mortal one. The position which counsel seeks to establish amounts to this: that if a competent physician and surgeon, in the treatment of a mortal wound directly causes death, although hastened by never so short a period, the assailant is excused, even although death would inevitably have resulted from the wound under any or in the absence of all treatment. Such is not the law. Neglect or mistreatment, and beyond such this case does not go, will not excuse, except in cases where doubt exists as to the character of the wound. Where death results in a case like the present, it can in no proper or legal sense be said to be the independent act of a third person. In a case where the wound is not mortal, the injured person may recover, and thus no homicide have been committed. If, however, death do result, the accused will be held responsible, unless it was occasioned, not by the wound, but by grossly erroneous medical treatment. But where the wound is a mortal one, there is no chance for the injured person to recover, and therefore the reason which permits the showing of death from medical treatment does not exist. *State v. Corbett,* 1 Jones (Law), 267; *State v. Morphy,* 33 Ia., 270: 11 Amer., 122, note and cases cited; Roscoe's Crim. Ev., 717.

*Second.* Justifiable Homicide. There is not a scintilla of evidence in the case tending to establish this defense, unless the fact that he had reason to believe that deceased was about to seduce and debauch his sister would be a justification. The undisputed evidence showed that the respondent took his gun, and went out into a field; that he got over into the road at the corner of the street going past the house where the deceased resided; that a person who then met respondent asked him what was going to take place, and he replied, "there will be a damned funeral here, for I am going

to shoot Bill Batey;" that he then went on up the street a little ways, drew up his gun and fired. At this time Batey was distant from him from ten to twenty rods, and was walking towards his (Batey's) house, in a direction away from the respondent; that after shooting, respondent reloaded his gun, put a cap thereon, and said 'he guessed Batey had something that would last him now.' The parties were not near each other; they had no altercation or personal difficulty; no threats of personal injury to respondent had been made by deceased, and as between these two parties there was no pretense of excuse or justification for the shooting.

It was said that the testimony given on the trial showed the reputation of the deceased for chastity was bad, of which fact the respondent had knowledge; that deceased had been arrested for the seduction of a Miss Briggs; that he had publicly stated in respondent's presence and hearing the manner in which he had seduced her; that while under such arrest he had stated that he wanted to seduce just one more girl, Sarah Cook, but this fact had not been brought to respondent's knowledge; that the night before the shooting deceased and Sarah Cook had been out together quite late; that on the morning of the shooting, respondent's sister, Sarah Cook, left the breakfast table and went over to the house of deceased; that she shortly afterwards returned, took her wearing apparel and announced that she was going off with Batey, bade the family good bye, and said they might never see her again.

The defense claimed the farther fact to be that Sarah Cook at that time was under the influence of drugs, administered to her by deceased, in order to enable him to accomplish his purpose, and that the shooting was believed by the respondent to be necessary in order to prevent such a result.

Certain alleged facts were offered and excluded by the court, for the reason, with others, that they had not been brought to the knowledge of the respondent

previous to the shooting, and this is alleged as a distinct ground of error.

This proposed evidence was properly excluded. Not being known to the respondent it could have made no impression upon his mind, and could not have influenced him in any degree in the commission of the fatal act.

Evidence of previous threats not communicated or known, is admissible to confirm or explain other evidence in the case tending to justify or excuse a homicidal act, as having been committed in opposing force to force in defence of life or to avoid great bodily harm. Such evidence is admissible, because, in connection with other evidence, it tends to show in cases of doubt who was the real aggressor, and the probable character of the assault made which had to be repelled, as a person who has made threats is more likely to make an assault upon another. In other words such evidence tends to show and explain the acts of the deceased at the time of the affray, and for this purpose the threat and not its communication, is the material fact. But where it is clear that the deceased, at the time the wound was inflicted, made no attempt to enforce his threats, or from the position of the parties could have made none, so that the accused could not reasonably have supposed that his life was in danger, or that he would receive grievous bodily harm, or that immediate action on his part was necessary to prevent a felony attempted by violence, then evidence of previous threats, whether known to the accused or not, are inadmissible in evidence. 2 Bishop Cr. Pr., § 627; 2 Whart. Cr. L., 1020; *People v. Lamb*, 2 Keyes, 360; *Powell v. State*, 19 Ala., 577; *Stokes v. People*, 53 N. Y., 164: 13 Amer., 498; *Dupree v. State*, 33 Ala., 380; *Newcomb v. State*, 37 Miss., 400; *Holler v. State*, 37 Ind., 56; *People v. Scoggins*, 37 Cal., 682; *Pitman v. State*, 22 Ark., 357; *Atkins v. State*, 16 id., 584.

Would then the belief which the respondent enter-

tained in reference to the injury to his sister justify him in the course which he adopted? It was argued that the law justifies homicide when committed in the defence of the chastity either of one's self or relation; that it is the duty of every one who sees a felony attempted by violence to prevent it if possible, and that life may be taken in so doing if necessary. Citing 4 Blackstone 181, and *Pond v. People*, 8 Mich., 177. The law is undoubtedly laid down in the authorities cited as claimed. But the felony in either case must be a forcible one.

Blackstone says the English law justifies a woman killing one who attempts to ravish her, and so too the husband or father may justify killing a man who attempts a rape upon his wife or daughter; but not if he takes them in adultery by consent, for the one is forcible and felonious but not the other. The principle, he says, which runs through all laws seems to be this: that where a crime in itself capital, is endeavored to be committed by force, it is lawful to repel that force by the death of the party attempting. It is not claimed that any direct force was attempted in this case, but that the felony intended was to be accomplished by the assistance of drugs administered or to be administered, and that where the power of resistance is thus overcome, and advantage thereof taken to violate her person, the act would be rape, and for such purpose the law would conclusively presume that sufficient force was used, at the time intercourse took place, to so characterize the act. The present case however falls short of coming within the principles which would justify the taking of life. The utmost that can here be said is, that the deceased had used and was likely to use fraudulent means, by administering drugs, to excite the passions, or overcome the resistance he otherwise would have been sure to encounter, in order to accomplish his purpose. So far as he had then gone, even conceding all that is claimed, fraudulent and not forcible means had been

resorted to, which would not create that necessity for immediate action on the part of the accused, by the taking of life, to prevent an attempted forcible felony. Ample time and opportunity existed to enable the accused to resort to other available and adequate means to prevent the anticipated injury. The evil threatened could have been prevented by other means within the reach and power of the accused. There was no such immediate danger, nor would the facts warrant the apprehension of such immediate danger, as would justify a resort to the means adopted.

It but remains to consider the third ground of defense relied upon, viz.: insanity.

Looking at the charge of the court upon this part of the case, in the light of the evidence which, it is claimed, tended to show insanity, we are of opinion that it was sufficiently full, clear and favorable to the respondent. We do not consider it necessary therefore to discuss at length this portion of the charge, or the exceptions taken thereto, or to the refusal to charge as requested. The respondent had a grievance in this case; it was based upon real and not imaginary facts. The deception or delusion under which he labored was not one of fact but of law, in supposing that he had a right to take life under the circumstances. This fully accounts for his action in the premises, but would not justify, excuse or exonerate him from the legal consequences of the act committed.

It must be certified to the circuit court that the exceptions are not well taken, and that the court proceed to judgment.

The other Justices concurred.