## DE ARMOND *v.* ARMSTRONG.

LIBEL.—*Pleading.*—*Introductory Matter.*—*Colloquium.*—*Innuendo.*—Where, in an action for libel, words alleged to have been published are not *per se* actionable, there should be a prefatory allegation of such extrinsic matter, or of such special meaning of the words as renders them libellous, and the *colloquium* should connect therewith the using or publishing of the words complained of, the *innuendo* giving to the words the interpretation borne by them in relation to the extrinsic fact or special meaning.

SAME.—*Justification.*—Although the truth of the matter charged to be libellous may be shown in defence, yet an answer, in order to make it a good justification, must specifically point out the acts of which the plaintiff was guilty, that the court may see whether the defendant was justified in what he published.

SAME.—*Evidence.*—Where the plaintiff, in such action, has alleged the meaning of certain words, and to whom they referred, he may prove by witnesses what they understood by the words and of whom they were published.

APPEAL from the Decatur Circuit Court.

PETTIT, J.—This was a suit by the appellee against the appellant for libel. The complaint was in two paragraphs. There was a motion to strike out the first paragraph, because it was the same as the second, overruled, and exception taken; a motion to strike out parts of this paragraph overruled and exception; and a demurrer for want of sufficient facts to it as a whole, and to its several parts, was filed, overruled, and exception. But we need not notice these rulings, or the errors assigned thereon, because this paragraph was subsequently withdrawn, and the case, so far as it was concerned, dismissed. This was done after the evidence had been given, and the arguments of counsel had been made, but before the instructions of the court had been given to the jury, and was objected and excepted to by the defendant, and is assigned for an error. But we hold that it was no error. 2 G. & H. 118, sec. 99, and the authorities cited in the notes fully warrant this action of the plaintiff and the court.

The case of *Ostrander* v. *Clark*, 8 Ind. 211, is cited to sustain the view of the appellant. That case decides that when an amendment is made, after the jury is sworn, which makes

an issue the jury were not sworn to try, it is error to proceed without re-swearing the jury. In this case the jury was sworn to try the issues. The withdrawal of the first paragraph of the complaint did not make a new issue, but simply withdrew one from the consideration of the jury. No new issue was formed, and the withdrawal of the paragraph could do no injury to the defendant.

The second paragraph of the complaint is as follows: Said plaintiff complains of said defendant, and says that the plaintiff is, and for many years past has been, a resident and citizen of Sand Creek township, of said county; that John Cheek was township trustee of said township from April, 1864, to April, 1867; that during the war for the suppression of the late rebellion, the President of the United States ordered a draft for men to serve in the armies of the United States, and that it became necessary for said township to furnish a quota of men, either by draft, volunteering, or hiring substitutes, or by otherwise obtaining credit to relieve said township from said draft; that for the purpose of collecting and disbursing money and means to clear said township from said draft, and for the relief of the drafted men of said township, the citizens of said township held a public meeting, on or about the 18th day of October, 1864, and elected and appointed the plaintiff, said John Cheek, and six others, citizens of said township, as a committee, and in behalf of the citizens of said township, to raise and expend money, and devise means for the purpose aforesaid; that thereupon said committee entered upon, and have ever since been engaged in, the discharge of their duties as such committee; that in the year 1864, said trustee, with the advice and consent of the board of county commissioners of said county, levied a tax on the property of said township, popularly known as the military tax, for the purpose, among others, of clearing said township from said draft, and reimbursing said committee the money borrowed by them for that purpose, also for the purpose of the relief of the drafted men of said township; that said tax was in part collected;

De Armond *v.* Armstrong.

that the plaintiff is, and for many years has been, a member of the Democratic party, and that on or about the 8th day of January, 1868, there was a state Democratic convention, held at the city of Indianapolis, which was attended by the plaintiff as a delegate from said county; that the words "red eye" and "critter" have acquired, in the neighborhood of the plaintiff, and in said county, a provincial meaning, and are understood to mean whisky, or other spirituous and intoxicating liquors; that at the March term, 1868, of the board of county commissioners of said county, one Michael Taney applied for license to retail intoxicating liquor in a less quantity than a quart at a time, in the town of Westport, in said township; that the plaintiff and others obtained and filed remonstrances before said board against the granting of said license; that when said cause came on for trial, at said court, Wren Grayson, one of the members of said board, was absent, and that in his absence said Taney failed to obtain said license; that the defendant, on or about the 28th of March, 1868, at said county, composed and caused to be published in a newspaper of general circulation, published in said county, called the Greensburg Herald, a certain false, scandalous, malicious, and defamatory libel of and concerning the plaintiff's character for honesty and sobriety, and of and concerning the honesty and fidelity of said committee in the discharge of their duties as aforesaid, in a part of which was and is contained the following: (1) "Chief among them is our delegate" (plaintiff meaning) "to the state convention" (meaning state Democratic convention aforesaid), "who helped to get through the celebrated whisky plank in the state platform, a good friend of 'red eye'" (meaning whisky or spirituous and intoxicating liquors) "then, but 'hell-bent' (excuse his language) against the 'critter'" (meaning whisky or other spirituous and intoxicating liquors) "now, probably caused by an overdose while at Indianapolis." (2)

(A) That the defendant meant and intended by the above words to charge that the plaintiff, while at the city of Indian-

apolis in attendance at the convention, as aforesaid, was guilty of the intemperate and inordinate use of whisky or other intoxicating liquors, and was so understood by the readers of said newspaper. (B)

And in another part of said article there was and is other false, scandalous, malicious, defamatory, and libellous matter, to wit:

(3) "They" (meaning certain parties of whom the plaintiff was one) "were on hand at the Republican convention, using their influence to induce the Republicans to nominate a man that they" (meaning the plaintiff and others) "could depend upon if elected, to cover up their" (meaning the plaintiff and others) "former rascality in township business. They" (meaning the plaintiff and others) "have a bad record, one that will not bear bringing to light, and they" (meaning plaintiff and others) "but use the whisky 'bugbear' for the purpose of directing attention from it." (4)

(C) And the plaintiff avers that the above words of said libel were composed and published by the defendant with the intent then and there to charge certain members of said committee and the plaintiff, as one of said members, with having fraudulently swindled and defrauded said township, or the citizens thereof, of money raised for the purpose of clearing said township from said draft, and for the relief of drafted men of said township. (D)

And in another part of said article occurs the following words:

(5) "During draft times, these 'round heads'" (meaning members of said committee, of whom plaintiff was one, and others) "did everything in their power to prevent the township from being taxed for the relief of drafted men, and partly succeeded on the last draft. However, when the tax was levied, they" (meaning the plaintiff as one of the parties and others) "had control of the money and committeed and trusteed it pretty much up; at any rate the twenty-six drafted men who got a township order, each for one hundred dol-

lars (although that amount was levied and collected of the people), never received one cent of the money." (6) ·

(E) That said defendant thereby meant and intended, and was understood by the readers of said paper to charge said committee and said trustee with the crime of appropriating to their own use, embezzling, and squandering moneys so said to have been committed to their control, and of corruption in the discharge of the duties imposed upon them by their fellow-citizens of said township. (F)

And in another part of said article there was and is contained the following libellous words: -

(7) "They" (meaning plaintiff and other members of said committee) "have spent some weeks in company with prominent Black Republicans of the township to prevent Democrats from pursuing a business authorized by the law of the State and the platform of their party" (meaning the retailing of intoxicating liquors). "They" (meaning certain parties of whom the plaintiff was one) "succeeded, by the absence of one of the commissioners" (meaning Wren Grayson, one of the county commissioners of said county), "supposed to have been occasioned by the use of their dollars" (8) (meaning money belonging to or controlled by parties of whom the plaintiff was one). (G) That said defendant meant and intended by said words to charge that certain parties, of whom the plaintiff was one, had been guilty of keeping Wren Grayson, one of the board of commissioners of Decatur county, from attending at a meeting of said board, when it was his duty to have been present, by bribing him with money to prevent him from discharging his duties as such officer. (H)

And in another part of said article there was and is the following libellous matter:

(9) "They" (meaning certain parties, of whom the plaintiff was one) "succeeded last spring" (meaning the spring election, 1867) "in forcing one of their clan upon the people for trustee" (meaning township trustee of said township), "and by his false promises to investigate these frauds of Cheek and others"

De Armond *v.* Armstrong. ·

(meaning the plaintiff as one of the parties), "got elected by a reduced majority." (10)

(I) That by the above words the defendant meant and intended, and was understood to mean and intend, to charge the plaintiff and other parties, members of said committee, with having corruptly and fraudulently defrauded the said township, or the people thereof, out of money raised by taxation and otherwise, while in the discharge of their duties as such committee, and with having connived at and consented to the making of false promises by a candidate for township trustee, of said township, for the fraudulent purpose of concealing their said crime from the public. (J)

That said article in each and every allegation is wholly false and untrue, and by means of its publication the plaintiff has been and is damaged and prejudiced in credit and reputation in the sum of ten thousand dollars, for which sum he demands judgment, and for all other proper relief.

There was a motion made to compel the plaintiff to separate his cause of action into paragraphs, which was properly overruled. All the matter is rightly in one paragraph. The defendant moved the court to strike out of complaint above set out all the parts from figure 1 to 2; from 3 to 4; from 5 to 6; from 7 to 8; from 9 to 10, and from letter A to B; from C to D; from E to F; from G to H; from I to J. This motion was overruled, and there was no error in this ruling. A demurrer for want of sufficient facts was filed to the complaint, as it appears above, and was properly overruled. The complaint is good in all respects.

It is argued that the innuendoes should have been stricken out, as they make words actionable which are not so in themselves, and enlarge and change the ordinary meaning of the words in the libel, which is not the office of an innuendo. This is true, unless, as in this case, there is a colloquium and prefatory allegation of some extrinsic matter, or an explanation of the particular meaning of words and phrases. *Ward* v. *Colyhan,* 30 Ind. 395; *Hays* v. *Mitchell,* 7 Blackf. 117.

De Armond *v.* Armstrong.

The defendant then filed his answer, in five paragraphs, as follows:

First.   General denial.

Second.   That he admits that said plaintiff was a member of the committee appointed to relieve Sand Creek township of the drafts of its citizens into the military service of the United States, and acted as such committeeman during the existence of such committee.   He admits that a tax was levied in the years 1864 and 1865 to raise money to fill the quota of said township under said call, but he denies that the funds raised by said taxes were at the disposal of said committee; that he did write the article which in part referred to the plaintiff, and from which the passages set forth in the complaint are extracts.   He denies that the innuendoes written in the complaint correctly state his intention and meaning, but that said article entire is as follows, viz.:

"FROM WESTPORT—A PLAIN TALKING LETTER, IN WHICH NAUGHTY QUESTIONS ARE ASKED, AND AN ANSWER EARNESTLY DESIRED — REPUBLICANS TAMPERING WITH OFFICIALS — BIRDS OF A FEATHER FLOCK TOGETHER—WHAT WENT WITH THE MONEY?

"*Editor Herald:*—I wish a small amount of space in your paper, for the purpose of informing your readers of the condition of the Democratic party in this township.   We have had heretofore from eighty to one hundred and fifty majority, which could easily be increased, were it not for some meddlesome individuals, who claim to be *par excellence* Democrats, equal in strength to the 'Brick Pomeroy make.'   They are, however, in faith like a certain clan of Democrats were in 1854.   They wish to dictate to other people what business they shall follow, and what they shall eat and drink while pursuing the same.   They are anti-whisky, anti-license, in short, Maine-law men, and from their actions we infer they have secret meetings, and if there was any dog-fennel, would be found wallowing in it equal to the dark lantern K. N.'s of that year.   Chief among them is our delegate to the

state convention, who helped to get through the celebrated 'whisky plank' in the state platform—a good friend of 'red eye,' but 'hell bent' (excuse his language) against the 'critter' now, probably caused by an overdose while at Indianapolis. Since his trip to the convention, there has been an application or two for licenses to sell liquor in Westport, and although by good Democrats and respectable citizens, this would-be leading Democrat (but, in fact, Puritan 'round head'), in company with a few others of the same stripe, and the leaders of the 'Manhood Mongrel' party have set up a furious howl, equal in fierceness to that of the Methodists or the K. N.'s of former years. They have spent some weeks canvassing among the people, getting signers to their remonstrance, and electioneering in support of their Maine-law notions.

"They have tried hard to defeat the calling of a Democratic convention, but, failing in this, are determined to drag their whisky notions in the political contest for the nominations.

"Already they have been canvassing and denouncing certain Democrats who have dared to announce themselves candidates without asking them, as 'whisky Democrats,' and as running on a whisky platform, and declaring, in advance of the nominations by the convention, that they cannot be elected if nominated.

"They have been for some time buttonholing the leaders of the opposition, and begging them to support their temperance candidate for justice, promising in return to support the balance of the Radical ticket. There is no doubt, from present indications, but that they have made up their minds, in case they fail to get one of their clan nominated, to bolt the nominations and support the Radical candidates. They were on hands at the Republican convention, using their influence to induce the Republicans to nominate a man that they could depend upon, if elected, to cover up their former rascality in township business. They have a bad record, one that will not bear bringing to light, and they

but use the 'whisky bugbear' for the purpose of diverting attention from it. During draft times, these 'round heads' did everything in their power to prevent the township from being taxed for the relief of drafted men, and partly succeeded on the last draft. However, when the tax was levied, they had control of the money, and committeed and trusteed it pretty much up; at any rate the twenty-six drafted men, who got a township order each for one hundred dollars (although that amount was levied and collected of the people), never received one cent of the money. Will Mr. Cheek tell the tax payers of this township what became of that money? Will he also tell them why certain Republicans like Cones, Elliott, and Johnson were let off paying their tax, and other poor men, good Democrats, had their property sold for this same tax? Mr. Cheek says there is a debt of nine hundred and fifty dollars yet owed for the first draft. Will he inform the people why he did not have the Republicans spoken of and others to pay their taxes as well as Democrats?

"If he had done this, the debt would not now be unpaid. But Mr. Cheek will say it was the fault of the county treasurer. This is not true, for the treasurer was ordered by these would-be kings of Sand Creek township not to push Messrs. Cones, Elliott, and Johnson. What their reasons were, we can only guess. Will Mr. Cheek also inform the people by what authority he acted in this tax collecting business, and whether or not he did it by authority of his being trustee? If so, will he tell the people why he charged his full pay as trustee, and some four hundred dollars besides, for handling and squandering this military fund? Mr. Cheek claims to be a good Democrat, of course, and gets very angry when any Democrat speaks of this matter, but the people have a right to judge a man by the company he keeps. He and Armstrong, Owens, and others may be seen eight or ten days of each week caucusing around Westport with such specimens of the 'manhood party' as Bill McCullough, Giddings, Boicourt, Grayson, and others of that ilk. They have

spent some weeks in company with prominent Black Republicans of this township, to prevent Democrats from pursuing a business authorized by law of the State and the platform of their party. They succeeded by the absence of one of the commissioners (supposed to have been occasioned by the use of their dollars). Such men have no business in the Democratic party. And for one, I am in favor of cleaning them out, like the Maine-law friends were in 1854. We will be better off without them, and the convention to-day ought to pass resolutions of expulsion against them. We have a hard contest before us this fall, and it will not do for us to undertake to carry these 'dead weights' any longer. They succeeded last spring in forcing one of their clan upon the people for trustee, and by his false promises to investigate these frauds of Cheek and others, got elected by a reduced majority.

"They also scratched the ticket, and defeated one of our best men for justice of the peace; afterward, being ashamed of it, turned round and charged it upon others, thus adding insult to injury. A nice set of 'leaders.' How long the party is to be cursed with them is the question here in Sand Creek.

[Signed]                                    FAIR PLAY."

And said defendant says he wrote said article because it is true, and so much of it as asks for information was legitimate and pertinent to matters about which he, as a citizen of said township, had a right to inquire. He says that said communication was not written or published through malice, and he asks to be discharged with his costs.

Paragraph 3. The defendant, for answer to the plaintiff's complaint, says that he admits the plaintiff was a member of the committee appointed to relieve Sand Creek township from the drafts then pending over said township, and continued such during its existence. He admits that a special military tax was levied in the years 1864 and 1865, to relieve said township of said drafts; but the defendant denies that said plaintiff, as one of said committee, had any power to

receive or disburse said money arising from such taxes in the manner hereinafter explained. The defendant admits that he wrote the article which in part referred to the plaintiff, and from which the passages set forth in the complaint are extracts; that he wrote the article as a citizen of Sand Creek township, upon the suggestion of a number of citizens of said township; that said extracts set forth in the complaint are not the whole of said article, and the circumstances which called it forth are not correctly stated in the complaint; that so far as the plaintiff is concerned, it is a true and lawful publication, such as defendant, as a citizen of said township, interested in its affairs, might lawfully make without incurring any responsibility to the plaintiff therefor; that the statements, so far as they referred to the plaintiff, were honestly made by the defendant, as a citizen of said township, anxious that a full and fair investigation should be had of all officials who had managed, and were to manage and control, its public money, particularly the fund known as the draft fund, in which the whole people of the township were interested; that the defendant had probable cause to believe, at the time of said publication, and did believe, that said statements, so far as they referred to the plaintiff, were true, and he further says that if any part of said article set forth in the complaint, and relating to the plaintiff, shall turn out to be otherwise than strictly true, then, so far as it may prove untrue, if in any particular, it was an honest mistake, made without ill-will or improper motives toward the plaintiff, into which defendant was led by the conduct and actions of the plaintiff himself, for which the plaintiff ought not to complain, and can hold the defendant to no legal accountability; that in the year 1864, a special tax for military purposes was levied upon the taxable property of the citizens of said township, by which $8,009.10 of taxes were carried upon the duplicate, which was placed in the hands of the county treasurer for collection; and that in the year 1865, a further special tax was levied upon the same property, by which $9,277.50

were carried upon the tax duplicate, in the hands of the county treasurer, for collection, which levies were afterward legalized by act of the legislature of Indiana, and by both levies the sum $17,286.60 were levied of the citizens of said township, but by some process, never publicly explained, favoritism was indulged in by those claiming the right to collect and manage the collection of said taxes, by which the following taxes were dropped from the tax duplicate of 1864, and never collected, viz:

Taxes of Robert Cones, $102.15; taxes of Ludlow Johnson, in name of Jerusha De Armond, $62.35; taxes of Sanford and Nancy Elliott, $54.65; in all, $219.35, so far as known to said defendant; that by the direction of said committee the taxes of a number of tax-payers were paid by notes not authorized by law; and said defendant says that the plaintiff counselled and connived at these illegal transactions, and claimed the right to do so as a member of said committee; that the sum of $6,787.80, at least, was paid to the members of said committee by persons who were drafted, making an aggregate military fund of $24,074.40, when only $17,000 was the net amount paid for the recruits by which said township was relieved from said draft; that twenty-six orders of $100 each, were issued to the persons who were drafted, by the trustee of said township, all of which are unpaid and still outstanding, and held by citizens of said township, to pay which orders said levy was in part made.

That on the 20th day of February, 1867, John Cheek, who was trustee of said township from April, 1864, to April, 1867, and a member of said committee also, made the only report of his official acts as such trustee that can be found, or is now on the files at the auditor's office of said county, by which it appears that said trustee claimed credit for $200 loaned the son of the plaintiff on the 21st day of July, 1866; for $100 loaned Amos Miller on the 29th day of July, 1866; for $229 loaned Lewis D. Owen, and $398.94 loaned William M. McCullough, another member of said committee, on the 26th day of October, 1866; and a further credit of $400 for

De Armond *v.* Armstrong.

orders, when none of said $2,600 of orders had, in fact, been redeemed; and a further credit of $576.35 for "amount received of treasury" in notes, accounts, etc.—making the sum of $1,904.29 of credits which do not appear as legitimate items of credit; that by said report $904.90 were paid out for officers' fees, and said trustee subsequently claimed and retained between $300 and $400 for his fees for collecting and paying out said fund; that said report claimed that $3,159.38 of said taxes were delinquent, when in fact no such sum was delinquent, a copy of which report is herewith filed and made a part hereof, viz.:

"Report of trustee of Sand Creek township, Decatur county, Indiana, to the county commissioners of said county, of the military fund belonging to said township, and the valuation of said township, and assessment for the years 1864 and 1865:

| | |
|---|---:|
| Valuation for 1864.......................................... | $533,882.00 |
| Assessment on each $100, 1.50......................... | 8,008.23 |
| For 1865................................................... | 579,844.00 |
| Assessment on each $100, $1.60...................... | 9,277.50 |
| Total assessment for 1864 and 1865.................. | 17,285.73 |
| Amount received........................................ | 14,126.35 |
| Delinquents............................................. | 3,159.38 |

AMOUNT RECEIVED AT DIFFERENT TIMES.

| | |
|---|---:|
| April 24, 1865, received from treasury............... | $4,982.57 |
| October 19, 1865, received from treasury........... | 1,272.55 |
| May 4, 1866, received from treasury................. | 5,738.94 |
| July 21, 1866, received from treasury............... | 300.00 |
| August 6, 1866, received from treasury............. | 100.00 |
| August 8, 1866, received from treasury............. | 100.00 |
| October 12, 1866, received from treasury........... | 29.00 |
| October 12, 1866, received from treasury........... | 398.94 |
| October 12, 1866, received in notes and accounts from treasurer........................................ | 576.35 |
| October 12, 1866, treasurer's fees .................. | 20.00 |

De Armond *v.* Armstrong.

| | |
|---|---:|
| January 14, 1867, received from treasury............ | $108.00 |
| February 16, 1868, received from treasury........... | 500.00 |
| Total received....................................... | $14,126.35 |
| Amount paid out.................................... | 14,064.57 |
| Amount on hands.................................... | $61.78 |

AMOUNT PAID OUT AT DIFFERENT TIMES.

| | |
|---|---:|
| January 14, 1865, Greensburg bank note........... | $300.00 |
| April 24, 1865, 2d Greensburg bank note.......... | 2,700.00 |
| October 19, 1865, O. Tousey, bank note............ | 2,258.00 |
| February 7, 1866, O. Tousey, bank note............ | 1,000.00 |
| March 22, 1866, Peter F. Hunter.................... | 1,012.00 |
| May 4, 1866, John M. Watson...................... | 3,304.70 |
| April 24, 1865, treasury fees........................ | 348.77 |
| April 24, 1865, orders.............................. | 400.00 |
| October 19, 1865, auditor's fees for 1864.......... | 255.00 |
| October 19, 1865, Morgan on delinquent........... | 22.91 |
| October 19, 1865, T. B. Peery .................... | 66.16 |
| May 4, 1866, treasurer's fees...................... | 322.16 |
| May 4, 1866, auditor's fees......................... | 100.00 |
| October, 1866, treasurer's fees..................... | 20.00 |
| July 21, 1866, loaned J. W. Armstrong............. | 200.00 |
| July 29, 1866, loaned Amos Miller................. | 100.00 |
| August 6, 1866, loaned L. D. Owens............... | 100.00 |
| August 8, 1866, loaned L. D. Owens............... | 29.00 |
| October 12, 1866, loaned L. D. Owens............. | 29.00 |
| October 26, loaned Wm. M. McCullough........... | 398.94 |
| October, received of treasurer in notes and accounts................................................. | 576.35 |
| October, treasurer overpaid and refunded........... | 25.00 |
| October 26, interest on bank note.................. | 27.00 |
| October 26, stamp, Hunter note.................... | .55 |
| September 26, 1865, stamps for township.......... | .50 |
| October 31, stamp on Peery........................ | .50 |
| October 20, 1864, John Cheek, books and stamp.. | 12.30 |
| January 27, 1865, stamp, Watson's first note....... | 1.65 |

De Armond *v.* Armstrong.

| | |
|---|---:|
| January 14, 1865, stamp, Sefton's first note......... | $1.60 |
| March 6, 1865, Watson's second note .............. | 1.85 |
| March 6, 1865, stamp, Sefton's second note ....... | 1.50 |
| January 14, 1867, paid on Sefton's note............. | 108.00 |
| February 16, 1867, paid on Sefton's note........... | 500.00 |

Total amount paid out.......................$14,064.57
Dated February 20, 1867.
[Signed]                    JOHN CHEEK, Trustee."
That on the 18th day of October, 1864, said John Cheek, as such trustee, issued, without authority of law, sixteen orders of the following purport, viz.:

"$1,000.. Trustee's office for Sand Creek township, Decatur county, Indiana, October 18th, 1864.

"This certifies that there is due, April 1st, 1865, Jacob F. Robbins, from this township, one thousand dollars, military funds, for value received, with ten per cent., payable as soon as there may be funds on hand.

"JOHN CHEEK, Trustee Sand Creek Township."

And he delivered them to eight several payees, viz.: M. H. Robbins, G. H. Robbins, and others, and that these items of credit, and these fees, and this mismanagement are meant and intended in the alleged libellous matter quoted in the complaint as follows: "However, when the tax was levied they had control of the money and committeed and trusteed it pretty much up;" that said plaintiff opposed and remonstrated against the levying of said tax, but when it was levied accepted the position of and acted as a member of said committee; that one Michael Taney had applied to the board of commissioners of Decatur county for a license to retail spirituous liquors in less quantity than a quart at a time, and his application, together with a remonstrance thereto, was pending before said board for trial at its session which began on the 1st Monday of March, 1868; that Wren Grayson, one of the members of said board of county commissioners, who lived in said township, and was an active

participant in the discussion of the matters agitating the people of said township, and resided close to the place where the applicant proposed to retail liquors, was absent on the day fixed for the trial of said application; and when the case was called two only of the members of said board were in attendance, and a division having taken place on a preliminary motion, the case was continued; that the absence of said commissioner excited some comment in the neighborhood, and was discussed by the petitioners and remonstrators.

That the alleged libellous matter quoted, "they succeeded by the absence of one of the commissioners, supposed to have been occasioned by the use of their *dollars*," was not intended to charge, nor does it charge, said plaintiff with the crime of bribery; that he was one of those who employed an attorney to resist the application of the applicant, and it was his efforts in this behalf, and nothing more, that was charged to him in the article referred to by which they prevented said Taney from pursuing a business authorized by the laws of the State; that the plaintiff attended the Democratic state convention in the spring of 1868, as a delegate, and soon after he came home announced himself as "hell bent against the critter;" that he did take a big drink of brandy at Indianapolis at the convention; that this sudden change in his opinions was noticed by his acquaintances and gave rise to the surmise that he had taken too much at Indianapolis; that said plaintiff, who had been an active participant in party politics in said township for years, was present at a Democratic convention and participated in its deliberations in the spring of 1867, when charges of corruption were made against those managing said military fund, in which Lewis D. Owens was nominated, the recognized personal friend of the plaintiff, and who was subsequently elected to said office and held it till April, 1868; that these well-founded suspicions were still entertained by the citizens of said township; that when the Republican nominating convention assembled in said township, in the spring of 1868, said committee were

De Armond *v.* Armstrong.

present, although four of them (and among that number the plaintiff) were Democrats and presented one of their number, Merrit H. Robbins, as a candidate for trustee; but so strong were the suspicions of the members of that party, of misman-agement of said military fund, that Mr. Robbins, of recog-nized popularity and ability, backed up by said committee, was defeated, and a candidate pledged to investigation elected; that the Democratic convention was approaching, and that party, the majority party in said township, and the defend-ant, as a member of that party, at the instance of his neigh-bors and friends, wrote the article from which the extracts in the complaint are made, to the end that the will of a great majority of the people of said township should be consulted and a candidate pledged to investigation of said affairs elected; that said plaintiff is a man of wealth, numerous relations, and immense power, and it was feared would succeed in control-ling said convention, as he desired, and defeat an investiga-tion of the matter of said military fund; that all these acts of the plaintiff and the committee, of which he was a mem-ber, were such as to fix in the minds of a large majority of the people of said township the well-founded suspicion that there had been mismanagement of said military fund, and the defendant, as a citizen of said township interested in the officers elected over him, without malice, ill-will, or improper motives toward the plaintiff, wrote the article from which the extracts in the complaint are taken, for himself and others, and subscribed thereto the signature of "Fair Play," for the public good; that the matters stated in the article concerned all the people of said township, and were such as he claims the right to publish upon the facts stated as a privileged com-munication. Said article is copied and a copy thereof hereto attached and made a part hereof. (See copy in the former part of this answer.) That said article (aside from its allu-sions to political opponents, which do not apply to the plain-tiff) was based upon the facts above alleged; if it contain any mistakes, they were caused by the plaintiff's own conduct, and he is therefore legally estopped from asserting a claim

for damages for mistakes occasioned by his own conduct; and the defendant demands judgment for costs. No question is made as to the ruling of the court on the fourth paragraph of the answer, and it is therefore omitted.

Paragraph 5. The defendant for fifth and further answer herein, says that he admits that he wrote the article, extracts from which are set out in the plaintiff's complaint herein, but he says that said extracts, and the interpretation thereof given in the complaint, do not express its meaning; that said article entire is as follows: (For copy of article see paragraph 2 of this answer.) *He says he wrote said article because it is true, and he hereby affirms the truth of so much of said article as is set out in the complaint.* He says that the sum of $17,000 was all that was paid for the credits procured by said committee, by which said township was relieved of the draft; that twenty-six orders of $100 each were issued by John Cheek, one of said committee, and trustee of said township, and delivered to the men drafted under said. call, and that to pay said orders and to relieve said township from said draft, said committee procured the trustee of said township to levy military taxes amounting to $17,286.60, which were passed to the tax duplicate of the county for collection, and at least $6,787.80 was paid to said committee as a military fund, making the sum of $24,074.40 of a fund under their control; that said committee purposely, fraudulently, and through favoritism caused the taxes of Robert Cones, Ludlow Johnson, and Sandford Elliott not to be collected, which taxes were legally assessed against them severally; that of said fund they paid or caused to be paid out $400 on illegal orders, which orders were known by them to be illegal at that time; $1,304.90 on fees of officers for its collection, when no such fees were allowed by law, and never accounted for $6,000 of said fund; and that without authority they loaned $1,904.29 of said fund, for which they obtained credit in their settlement of account with the board of commissioners of said county; that said plaintiff received as payment of the

donation of Rufus Brunton, one field of corn at $75, and for which he only accounted to said fund in the sum of $40; that the question of levying said taxes was twice submitted to the people of said township, and at the first submission the plaintiff opposed the levying of a tax, and on the second occasion favored it, on condition that the drafted men would contribute a part of the fund necessary to relieve the township; that no part of said twenty-six orders were paid at said date, and he, therefore, says that it is true that "during draft times said plaintiff and others did everything in their power to prevent the township from being taxed for the relief of drafted men, and partly succeeded on the last draft. However, when the tax was levied they had control of the money, and committeed and trusteed it pretty much up; at any rate the twenty-six drafted men, who got a township order each for one hundred dollars (although that amount was levied and collected of the people), never received one cent of the money;" that said plaintiff and three of his colleagues on said committee were Democrats; that he was an active participant in the conventions of his party in said township; but he and his colleagues attended the Republican convention in said township in the spring of 1868, and used their influence to induce the convention to nominate Merrit H. Robbins, one of said committee, for township trustee, at the approaching election, for the purpose of covering up their said record in said township business; that one of the questions agitating said township at that time was whether or not the conduct of said committee should be investigated, and that said Robbins was opposed to said investigation; and the defendant affirms that it is true that the plaintiff and his colleagues "were on hand at the Republican convention, using their influence to induce the Republicans to nominate one of their number, that they could depend upon to cover up their former rascality in the management of said fund," and that they had "a bad record, one that would not bear bringing to light," and professed to be opposed to the granting of a license to retail liquor, and called

the persons in favor of investigation "whisky men," as a whisky " bugbear," for the purpose of directing attention from it; that on the day the application of said Taney was set for hearing before the board of commissioners of said county, said Grayson was absent, and the application of said Taney was continued, a division having taken place on a preliminary motion; that the absence of said Grayson was procured by the said remonstrators who caused a telegram to be sent to said Grayson from a point on the line of the Indianapolis, Cincinnati & Lafayette railroad, west of Greensburg, on that day, summoning him hence on what he supposed to be important business; that said plaintiff was one of the remonstrators, and that prominent Republicans of said township were remonstrators also, with whom said plaintiff had frequent conferences, and the defendant therefore affirms that it is true, "that they have spent some weeks in company with prominent Black Republicans of said township to prevent" said Taney, who was a Democrat, "from pursuing a business authorized by the laws of the State and the platform of his party; and they succeeded by the absence of one of the commissioners, supposed to have been occasioned by the use of their dollars;" that in the spring of 1867, one Lewis D. Owens, the choice of the plaintiff, and of said committee, was nominated, in the Democratic township convention, for township trustee, in which convention frauds were charged against said committee, after he had pledged himself to investigate the action of said committee in the matter of said township fund, and which pledges he did not redeem; and that he was elected by less than the usual Democratic majority, wherefore the defendant says that it is true that "they succeeded last spring in forcing one of their clan upon the people for trustee, and by his false promises to investigate these frauds of Cheek and others" (meaning the matters before in answer alleged) "got elected by a reduced majority;" that the Democratic state convention, in the year 1868, was attended by said plaintiff, as a delegate from said township, and passed a resolution against laws prohibiting the sale of lager beer on Sun-

day, and against those laws which restrict the Germans from their Sunday recreations, which was known as the "whisky plank," and from that time hence said plaintiff was, and is, opposed to the granting of a license to retail liquor, and while attending said convention was exposed to an opportunity to use excessively that kind of stimulants known as "red eye," and did take too much of that article; and the defendant alleges that it is true that "chief among them;" (those of whom the communication speaks "was our delegate to the state convention, a good friend of whisky at the time of said convention, but hell bent, according to his own declarations, against the critter at the date of said communication, which change was occasioned by an overdose of something at the state convention." Wherefore said defendant says that said article thus construed is true, and is the article written by the defendant, and that it was written without malice and in good faith, and so understood by those who read it, and this he is ready to verify.

The plaintiff filed a motion to strike out the fifth paragraph of the answer, which was rightfully overruled. The plaintiff then filed separate demurrers to the second, third, fourth, and fifth paragraphs of the answer for want of sufficient facts to constitute a defence.

The demurrer was sustained to the second, third, and fourth paragraphs of the answer, and overruled as to the fifth paragraph. Proper exceptions were taken, and the sustaining the demurrers to the second and third paragraphs of the answer is assigned for error. Was sustaining these demurrers error?

It is true that in this State the truth of libellous matter may be given in evidence in justification. Const. Ind., art. 1, sec. 10; 2 G. & H. 110, secs. 86, 87. And, as a consequence, it may be pleaded; but how must it be pleaded? is the question. These answers say that the defendant "wrote the article because it is true," in the second paragraph, and in the third it says, "that so far as the plaintiff is concerned, it

is a true and lawful publication," without affirmatively charging the plaintiff with the wrongs, which he, in his complaint, says were charged against him. In an answer, in order to make it a good justification, the defendant must specifically point out the acts of which the plaintiff was guilty, in order that the court may see whether the defendant was justified in what he published. *Johnson* v. *Stebbins*, 5 Ind. 364; 1 Starkie Slander, 477; 1 Hilliard Torts, 429, etc. These paragraphs fall greatly short of this requirement, and the demurrers were properly sustained to them.

The court allowed the plaintiff, over the objection of the defendant, to prove by witnesses who and what they understood certain words in the published article to mean and refer to. This was allowable, and its correctness is sustained by numerous authorities. *Smawley* v. *Stark*, 9 Ind. 386; *Justice* v. *Kirlin*, 17 Ind. 588; *Proctor* v. *Owens*, 18 Ind. 21; *Miller* v. *Butler*, 6 Cush. 71; 1 Hilliard Torts, 305. The plaintiff had alleged, as a matter of fact, what their meaning was, and he had a right to prove his allegation.

There was a reply of general denial to the fifth paragraph of the answer, which made the issues under it and the general denial.

Trial by jury; verdict for the plaintiff for one hundred and seventy-five dollars; motion for new trial overruled, and judgment on the verdict.

We have examined this record and the briefs of both parties carefully, and we are satisfied that no error was committed in the court from which this case came, to the prejudice of the appellant, and as sec. 101, 2 G. & H. 122, says "the court must, in every stage of the action, disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party, and no judgment can be reversed or affected by reason of such error or defect," it is our duty to say that no substantial or legal right of the appellant has been affected by the action of the court below.

The judgment is affirmed, at the costs of the appellant.*

*N. Trusler, J. S. Scobey, C. Ewing, J. K. Ewing,* and *W. O. Foley,* for appellant.

*W. Cumback, S. A. Bonner, J. Gavin,* and *J. D. Miller,* for appellee.

*Petition for a rehearing overruled.