## WASHINGTON POST CO. v. KENNEDY.

(Court of Appeals of District of Columbia.
Submitted December 10, 1924. De-
cided January 5, 1925.)

No. 4142.

**Libel and slander** ⟨⟩21—**Newspaper item re-
porting arrest of "Harry Kennedy, an at-
torney," held libelous as to "Harry F. Ken-
nedy," only attorney in city.**

Newspaper item reporting arrest of "Har-
ry Kennedy, an attorney, 40 years old," for
forgery, *held* libelous as to "Harry F. Kenne-
dy," the *only* lawyer by that name in the Dis-
trict, and about 37 years of age, where person
in fact arrested was "Harry P. L. Kennedy,"
and from Detroit, though publisher intended to
refer to "Harry P. L. Kennedy."

Appeal from Supreme Court of District
of Columbia.

Action by Harry F. Kennedy against the
Washington Post Company. Judgment for
plaintiff, and defendant appeals. Affirmed.

W. J. Lambert and R. H. Yeatman, both
of Washington, D. C., for appellant.

A. H. Bell and P. H. Marshall, both of
Washington, D. C., for appellee.

Before MARTIN, Chief Justice, ROBB,
Associate Justice, and HATFIELD, Judge
of the United States Court of Customs Ap-
peals.

ROBB, Associate Justice. Appeal from
a judgment in the Supreme Court of the
District of Columbia for the plaintiff, ap-
pellee here, in an action for libel.

Harry P. L. Kennedy was arrested in
Detroit, Mich., on a charge of forgery, and
returned to the District of Columbia, where
a memorandum of his arrest was made in
the arrest book at police headquarters. This
memorandum reads as follows:

"Person arrested: Kennedy, Harry P.
L. Charge: Forgery. Lawyer. ———
———. Complainant: Melville Bush, 109
Corlers Ave., Athenhurst, N. J. Citizen U.
S. Single? Yes. Age: 40. Color: B.
Off.: Vermillion. Dis. given to U. S. mar-
shal. Date of complaint: May 12, 1923."

On the next day the defendant published
in its newspaper the following article:

"Attorney Held as Forger.

"Harry Kennedy Brought Back from De-
troit to Face Charge.

"Harry Kennedy, an attorney, 40 years
old, was brought back to Washington from
Detroit yesterday to face a charge of for-
gery.

"According to Headquarters Detective
Vermillion, who trailed Kennedy to Detroit,
the man forged the name of a client for
$900."

The plaintiff was generally known in the
District of Columbia as Harry Kennedy,
was the only lawyer by that name in the
District, and his age at that time was about
37 years.

The sole question here is whether the omis-
sion in this publication of the initials of
the person actually arrested formed a legal
basis for an action for damages by the plain-
tiff, to whom the article by reason of such
omission was generally understood to refer,
and to whom the jury found, under proper
instructions from the court, that the arti-
cle did in fact refer.

The first case brought to our notice and
involving a similar question is Hanson v.
Globe Newspaper Co. (1893) 159 Mass.
293, 34 N. E. 462, 20 L. R. A. 856. There
an article was published designating the ar-
rested person as "H. P. Hanson." The per-
son actually arrested was A. P. H. Han-
son. H. P. Hanson thereupon brought suit.
the case was tried without a jury, and the
trial judge found as a fact that the alleged
libel was not published of and concerning
the plaintiff. In a five to four decision, the
Supreme Court of Massachusetts sustained
this ruling. The minority opinion was writ-
ten by Justice Holmes, now a Justice of the
Supreme Court of the United States, whose
reasoning was the same as that of the court
in Jones v. E. Hulton & Co., [1909] 2 K. B.
D. 444. In that case a newspaper published
defamatory statements of a named person,
believed to be a fictitious personage with an
unusual name, "Artemus Jones." It devel-
oped that there was a man named Thomas
Artemus Jones, who was generally known
as Artemus Jones. He brought an action
for libel and a judgment in his favor was
affirmed.

Lord Chief Justice Alverstone expressed
the opinion that it was a question of fact
"whether the person referred to in the libel
would be understood by persons who knew
him to refer to the plaintiff. * * * There
is abundant authority to show that it is not
necessary for every one to know to whom
the article refers; this would in many cases
be an impossibility; but if, in the opinion
of a jury, a substantial number of persons
who knew the plaintiff, reading the article,
would believe that it refers to him, in my
opinion an action, assuming the language to
be defamatory, can be maintained; and it

makes no difference whether the writer of the article inserted the name or description unintentionally, by accident, or believing that no person existed corresponding with the name or answering the description. If upon the evidence the jury are of opinion that ordinary sensible readers, knowing the plaintiff, would be of opinion that the article referred to him, the plaintiff's case is made out."

Lord Justice Farwell concurred in this judgment, while Lord Justice Moulton dissented. In his concurring opinion Lord Justice Farwell said: "The rule is well settled that the true intention of the writer of any document, whether it be contract, will, or libel, is that which is apparent from the natural and ordinary interpretation of the written words; and this, when applied to the description of an individual, means the interpretation that would be reasonably put upon those words by persons who knew the plaintiff and the circumstances. * * * In my opinion the defendant intended the natural meaning of his words in describing the plaintiff as much as in the innuendo; the inquiry is not, what did the defendant mean in his own breast, but what did the words mean having regard to the relevant surrounding circumstances."

In Joseph Larocque v. New York Herald Co. (Feb., 1917) 220 N. Y. 632, 115 N. E. 1042, an action for damages for libel based upon an article which was correct, except that the name of John Larocque was erroneously printed as "Joseph Larocque," the Court of Appeals of New York, six justices sitting, unanimously sustained a judgment for the plaintiff. The court evidently regarded the plaintiff's right to recover in such a case as so well settled, in that state at least, that no written opinion was filed.

We are impelled to adopt the reasoning of Justice Holmes and Lord Chief Justice Alverstone, as the Court of Appeals of New York evidently has done. Unless the true intent of the publisher of libelous matter is to be gathered from the contents of the article, rather than from what the writer subsequently says was in his mind, innocent parties may suffer without redress. This is requiring nothing more than accuracy on the part of the writer. To illustrate: Assuming in the present case that the initials of the Kennedy arrested had been the same as those of the plaintiff, and that the police record had described the former as a resident of Detroit, Mich., can it be that the publisher might escape liability for omitting the description by stating that he intended to refer to the Detroit Kennedy, and not to the local Kennedy? Or, assuming that the Kennedy arrested was described as an automobile salesman, and that had been omitted from the description. In each instance the matter omitted would clearly have distinguished the two Kennedys, and the local Kennedy would not have been harmed. So, here, had the publication been accurate, Harry F. Kennedy's friends would have known that it did not refer to him, and those knowing him only slightly could have seen that the writer did not mean him by referring to a local directory.

The opinions of Justice Holmes and Lord Chief Justice Alverstone contain such a full and satisfactory discussion of the principles here involved that we forbear further discussion. The judgment is affirmed, with costs.

Affirmed.