Civil action to recover damages resulting from the publication of a libel.
The defendant is a corporation which publishes and circulates TheGreensboro Daily News and The Greensboro Record, two daily newspapers published in the city of Greensboro. On 30 August, 1937, it published inThe Greensboro Daily News an Associated Press dispatch from Atlantic City, N. J., under date of 29 August, reciting the round-up and arrest of alleged members of a vice ring which was operating in several cities of the United States. It stated that Harry L. Roth, who was arrested in New York, was listed by the Assistant U.S. District Attorney as a principal defendant; that Roth was released from the Federal Penitentiary 9 February after serving two years on a Mann Act conviction and that his record showed arrests in New York, Philadelphia and Detroit on Mann Act and other charges. On 31 August, 1937, it carried another Associated Press dispatch in which, among other things, it was stated that "Harry Roth 42 year old New Yorker who was linked to Luciano by J. Edgar Hoover, Chief of the Federal Bureau of Investigation, was committed to Mercer County Jail today in default of $25,000 bail." It was stated that "Roth was charged with transporting a girl identified as Teddy Blaine from Philadelphia to Atlantic City for immoral purposes."
This article repeated that Roth was charged with transporting a girl from one State to another for immoral purposes and that the raids were part of the concerted drive by the F. B. I. to stamp out the White Slave Traffic.
The Greensboro Record, in its edition of 30 August, 1937, carried an Associated Press dispatch under Trenton, N. J., date line, containing, among other things, the statement that "Federal agents plan to bring here from New York for questioning today a man identified by Hoover as Harry Roth who he said was reputedly a member of the Charles (Lucky) Luciano Gang."
This article quoted the Federal Agent as stating that 37 prisoners arrested were "principals, procurers and madames."
On the night of 31 August, one Morgan, F. B. I. agent stationed at Greensboro, telephoned J. N. Benton, engaged by the defendant as a newspaper reporter on The Record, and told him that he, Morgan, had just returned from Newark where he had engaged in the raids and that he thought there was a local story in connection with this raid in Jersey City and surrounding New York and that one of the men referred to in the Associated Press dispatch carried that morning was named Harry Roth and that he understood that Roth was formerly in Greensboro; *Page 16 
that Roth had been tried here (Greensboro) some two or three years previous on a white slavery charge similar to the one he had just been arrested for and that he (Benton) could check up on it and get a local story probably. Benton, whose duty it was in part to prepare the column of the events of 10, 20 and 30 years ago carried by The Record, was aware of the fact that Roth Brothers had purchased the Palace Theatre in Greensboro in 1927. He mentioned that fact to Morgan and Morgan in reply stated that he understood that Roth, who was arrested in New York, "had been in the entertainment business."
The next morning Benton examined the Greensboro City Directory. In the 1928 directory he found listed, "Harry Roth, Palace Theatre, residence Y. M. C. A."; in each of the 1929 and 1930 directories he found, "Harry Roth (Palace Theatre) Asheville, N.C." The name harry Roth did not appear in either the 1931 or 1932 directory. Benton then went to the office of the Clerk of the United States District Court where he ascertained that one Harry Roth was tried at the June Terms, 1935, under the Mann Act and sentenced to three years imprisonment.
Thereupon, without any investigation at the Palace Theatre or at the Y. M. C. A. and without any further inquiry, Benton wrote for publication and the defendant published in its Greensboro Record, on 1 September, 1937, under the large type headlines, "VICE RING MAN IS KNOWN HERE" the following article: "Harry Roth One of Men Taken at Atlantic City in Roundup, Once Lived Here. The recent raid of the federal investigators in Atlantic City, N. J., and other cities that resulted in the arrest of Harry Roth on Monday night, is of local interest as Roth formerly resided in Greensboro. He is now under $25,000 bond, being charged with complicity in gigantic vice operations in violation of the Mann White Slave Law. Between 125 and 150 men were taken into custody as a result of the drive, headed by J. Edgar Hoover. Roth is regarded as one of the higher-ups in the conspiracy.
"Roth, 42, listed as resident of New York, was for a time connected with the Palace Theatre in Greensboro, it is understood. In June, 1935, he was tried in United States Court for violation of the Mann White Slave Act and give two years in Atlanta on each of four counts, the sentences to run concurrently. It will be recalled that he was arrested in San Francisco, Calif., after federal officers had traced him to various parts of the country. He was specifically charged with inducing young women to go from Greensboro to New York, promising employment. Arriving in the metropolis, it was brought out during the trial, the true motive of the journey was revealed and several girls testified to their experiences after making the trip to New York on the promise of employment. *Page 17 
"After Roth was arrested in San Francisco it was necessary to have one of the prosecuting witnesses taken to the Pacific coast city for purpose of identification, the prisoner resisting removal.
"R. L. Morgan, of the Greensboro office of the F. B. I., was among the number summoned to New York and Atlantic City to assist in the vice gang roundup. He returned home Tuesday."
On the afternoon of 1 September, after the issue of The Record
containing said article was put in circulation, Max Zager, who operates the Palace theatre in Greensboro under lease from plaintiff and his brother, after reading the article, called The Greensboro Record and asked them how they knew it was the Harry Roth that was formerly connected with the Palace Theatre. Defendant's agent in answer advised him that the information they got was from the F. B. I. man who told him he was; that the F. B. I. man had questioned this man and he told them he formerly lived in Greensboro and he operated the Palace Theatre. Zager then advised the defendant through its agent that the Roth who was formerly connected with the Palace Theatre was much younger than 42 years of age, that he was a man of food character and good habits and that he was sure that he was not linked up in that affair. The agent of the defendant then advised Zager that that was the information they received from the F. B. I. man. Zager then called plaintiff's brother at Harrisburg, Va., and inquired if the report was true. He was advised that it was not, that plaintiff resided in Suffolk, Va. On the same afternoon Mr. Stern likewise phoned the defendant relative to the article and advised the defendant that it had made a mistake.
Upon receiving the information from Zager and Stern, Benton advised the managing editor of the News of the mistake and suggested that the article be not published in the morning edition of the News. Thereafter, there was no further publication in either The Greensboro News or The GreensboroRecord in anywise referring to plaintiff except that The Greensboro Record
in its issue of 2 September, carried the following article:
"ANOTHER HARRY ROTH FIGURES IN AFFAIR,
"The Greensboro Record was informed Wednesday afternoon that the Harry Roth, arrested in the vice raids in Atlantic City and other northern cities Monday night, was not the Harry Roth who some years ago was connected with the Palace Theatre, as was stated in the article in Wednesday's Record. The Harry Roth who was engaged in business here was a much younger man, it was said, and he was a young man of exemplary habits and character, according to citizens who were personally acquainted with him.
"The statement in Wednesday's paper was based on information that the prisoner, following arrest in New Jersey, had indicated to officers he was at one time movie business in Greensboro." *Page 18 
On 11 September, 1937, plaintiff wrote The Greensboro Record calling attention to the article of 1 September and its contents and demanding a retraction in the following language:
"Said statements as appeared in your paper are false and untrue and I hereby demand a full and fair correction, apology and retraction published in your paper and in as conspicuous a place and type as was the article published by you on September 1, 1937." The letter was received by the managing editor of defendant and he, in reply, in behalf of The GreensboroRecord, wrote the plaintiff enclosing a copy of the article which appeared in The Greensboro Record of 2 September and requested that if said article did not meet with plaintiff's approval he so inform The Greensboro Record. The defendant received no reply, published no retraction and took no further action in respect thereto.
Plaintiff instituted this action 20 October, 1937, to recover damages, both compensatory and punitive.
In answer to appropriate issues submitted, the jury found that the article published by defendant 1 September, 1937, was published of and concerning the plaintiff Harry Roth and assessed compensatory damages, but answered the issue as to punitive damages in the negative. There was judgment on the verdict and the defendant excepted and appealed.
On this appeal the defendant presents a number of questions for determination: (1) Did the court err in overruling the defendant's motion for judgment as of nonsuit on plaintiff's first cause of action for compensatory damages? (2) Did the court err in overruling defendant's motion for judgment as of nonsuit on plaintiff's second cause of action for punitive damages? (3) Was it error for the court to admit evidence of defendant's financial worth? (4) Did the court err in refusing to charge the jury that it would be warranted in awarding only nominal damages as prayed by the defendant? And, (5) Did the court err in failing to give the defendant's special prayer for instructions to the effect that the jury should answer the first issue "No"?
The article not only states that Roth was arrested on a charge of violating the White Slave Act and with imprisonment in default of bond but it likewise attributes to him conduct of such vile baseness and depravity as to indicate a total lack of any sense of the social duty that a man owes to his fellow man and to society. If it had reference to the plaintiff it was false. This is conceded by the defendant. Being false *Page 19 
it is a libel per se. Flake v. News Co., 212 N.C. 780, 195 S.E. 55. The court below so instructed the jury, to which there is no exception.
On the defendant's motion to nonsuit on the first cause of action and its prayer for a directed verdict, on the first issue then, the only question to be determined is as to whether there was sufficient evidence that the publication was "of and concerning the plaintiff."
The testimony of the witness Benton Clearly indicates that he wrote the article because of its supposed local interest and concerning the Roth who formerly operated the Palace Theatre and resided at the Y. M. C. A. It was so understood by the witness Zager and by Mr. Stern and by others who accosted and joked the plaintiff in respect thereto. After receiving a phone call from Zager, Benton informed the managing editor that there had been a mistake. The managing editor wrote the plaintiff that the information was obtained from the Federal investigator Morgan stating "Investigator Morgan told this newspaper that Roth stated he has been connected with the Palace Theatre in Greensboro." In the publication attempting to correct the false impression made the defendant stated that: "Another Harry Roth Figures in Affair;" and that it was informed "That the Harry Roth arrested in the vice raids in Atlantic City and other northern cities Monday night was not the Harry Roth who some years ago was connected with the Palace Theatre." Benton likewise testified that when he wrote the article "he was under the impression that the man referred to therein was formerly connected with the Palace Theatre."
It would seem, therefore, that the article was not only understood by those who read it as being of and concerning the plaintiff but that the defendant, by mistake of fact, so intended it. In any event, the evidence raises an issue of fact which was properly submitted to the jury. On the issue so submitted the court charged the jury fully in the language of special instructions prepared by learned counsel for the defendant. Naturally the charge on this aspect of the case was as favorable to the defendant as the law would permit. At least there is no exception thereto.
Under the view we take of the evidence the second and third questions may be treated as one.
When the allegations of the complaint are sufficient to support a demand for punitive damages, and there is testimony tending to support the allegations, evidence of the pecuniary circumstances and wealth of the defendant is competent on the issue thereby raised. Adcock v. Marsh,30 N.C. 360; Reeves v. Winn, 97 N.C. 246, 1 S.E. 448; Bakerv. Winslow, 184 N.C. 1, 113 S.E. 570, and authorities therein cited at p. 10. *Page 20 
In some jurisdictions it is held that where malice exists exemplary damages may be given, and that it is immaterial whether the malice is actual or such as is implied in law for the publication of a libel per se. 25 Cyc., 536, et seq. It this jurisdiction punitive damages may not be awarded on a showing of implied malice only. To support an award of vindictive damages it must appear that the publication was prompted by actual malice (as contra-distinguished from imputed malice, or malice implied by the law from intentionally doing that which in its natural tendency is injurious), or that the defamation was recklessly or carelessly published. Baker v. Winslow, supra; Gilreath v. Allen, 32 N.C. 67; Bowdenv. Bailes, 101 N.C. 612; Upchurch v. Robertson, 127 N.C. 127. Such damages may be awarded when there is evidence of oppression, or gross and will full wrong; Reeves v. Winn, supra; or a wanton and reckless disregard of the plaintiff's right: Fields v. Bynum, 156 N.C. 413, 72 S.E. 449; or of gross indifference; Woody v. Bank, 156 N.C. 549, 140 S.E. 150; or reckless and criminal indifference to plaintiff's rights; Hall v. Hall,179 N.C. 571, 103 S.E. 136.
The F. B. I. agent stated to the defendant's news agent that he understood the Roth arrested "was formerly in Greensboro and had been tried in Greensboro," and that "he had been in the entertainment business." He did not state that he was formerly a resident of Greensboro or that he had ever been connected with the Palace Theatre. The reporter ascertained a man by the name of Roth had been for an undisclosed length of time, in Greensboro pursuing his vocation as a professional primp and had been arrested and tried in the United States District Court. He further ascertained that Roth, the plaintiff, formerly resided in Greensboro at the Y. M. C. A. and was connected with the Palace Theatre. He published the article without investigation either at the place of employment or at the palace of residence of the Roth about whom he wrote when such an investigation before the publication would have disclosed the true facts. The managing editor stated to Zager that the F. B. I. agent had told him that the Roth who was arrested was a man who formerly lived in Greensboro and operated the Palace Theatre. The record fails to disclose that such information was received from the F. B. I. agent.
"A good name is rather to be chosen than great riches." A good reputation, when based on sound character, is a man's most precious possession. No publication, the tendency of which is to seriously impair or destroy a good name, should be permitted without most careful investigation. The failure to go to a known and easily available source of information, coupled with other facts and circumstances which appear in this record and considered in connection with the presumption of legal malice arising from the publication of a libelous article, constitutes more *Page 21 
than a scintilla of evidence tending to show that in publishing the article the defendant acted with reckless disregard of plaintiff's rights and is sufficient to support the submission of an issue of punitive damages. This is all we are required to determine.
A consideration of the whole record leads to the conclusion that the defendant acted through an honest mistake. The jury accepted that view of the evidence and answered the issue on punitive damages in the negative. But, an honest mistake will not protect the defendant. Washington Post v.Kennedy, 3 F.3d 207, 41 A.L.R., 483; also see Anno. 26 A.L.R. 464,et seq.
As there is sufficient evidence to be submitted to the jury on the issue of punitive damages there was no error in the admission of testimony relating to the defendant's financial condition.
Nor is the defendant protected by its publication of 2 September in which it corrects, on information, the publication of 1 September. The plaintiff duly served notice on the defendant by letter, the receipt of which is admitted, demanding a retraction as provided by ch. 557, Public Laws 1901; C. S., 2430. If the defendant desired to avail itself of the provisions of this statute it was its duty to publish an apology and retraction as prescribed by statute. This is did not do.
While the statute, C. S., 2430, does not require the retraction to be in any particular form or couched in any particular language, it does require "a full and fair correction, apology and retraction" which must clearly refer to and admit the publishing of the article complained of and directly, fully and fairly, without any uncertainty, evasion or subterfuge, retract and recall the alleged false and defamatory statements and apologize therefor. Oray v. Times Co. (Minn.), 77 N.W. 204. The alleged correction falls far short of this requirement. It neither retracts nor apologizes therefor, but merely states that the defendant is then in possession of information contra that contained in the original publication. See Osborn v. Leach, 135 N.C. 627; Paul v. Auction Co.,181 N.C. 1, 105 S.E. 881.
The demand for the apology gave the defendant the election of complying therewith or risking the consequence of noncompliance. It was not the duty of the plaintiff to approve or disapprove the article already published. Failure to do so does not exculpate the defendant or protect it against the submission of any issue of punitive damages on a proper showing.
It may be noted under express terms of C. S., 2430, the publication of the apology and retraction standing alone is not sufficient. It must be made to appear further in the trial that "said article was published in good faith, that its falsity was due to an honest mistake of fact, *Page 22 
and that there were reasonable grounds for believing that the statements in said article were true."
While the court declined to charge the jury in substance that it would be warranted in awarding only nominal damages as prayed by the defendant, it did charge the jury on the issue of damages that "if the plaintiff would recover more than nominal damages under the second issue, he must satisfy you by the greater weight of the evidence in this case that he is entitled to recover actual damages of the defendant . . . your award of damages to plaintiff under the second issue will be confined to nominal damages unless the plaintiff establishes by the greater weight of the evidence that he has suffered actual damages as the direct and proximate result of the wrongful acts and conduct of the defendant." If there was any error in this charge it was favorable to the defendant.
When an unauthorized publication is libelous per se, malice and damage are presumed from the fact of publication and no proof is required as to any resulting injury. The law presumes that general damages actually, proximately and necessarily result from an unauthorized publication which is libelous per se and they are not required to be proved by evidence since they arise by inference of law, and are allowed whenever the immediate tendency of the publication is to impair plaintiff's reputation, although no actual pecuniary loss has in fact resulted. Flake v. News Co., supra;Bowden v. Bailes, supra; Fields v. Bynum, supra; Hamilton v. Nance,159 N.C. 56, 74 S.E. 627; Barringer v. Deal, 164 N.C. 246,80 S.E. 161; Paul v. Auction Co., supra Baker v. Winslow, supra; Jones v.Brinkley, 174 N.C. 23, 93 S.E. 372; N. Y. Evening Post Co. v.Chaloner, 265 F., 204, 36 C. J. 1150; Oates v. Trust Co.,205 N.C. 14, 168 S.E. 869.
In the Bowden case, supra, a charge that "the plaintiff is entitled to some damages" resulting from a slander per se was affirmed. In theBarringer case, supra, citing the Hamilton and Fields cases, supra, it was held that on a slander per se compensatory damages which embrace compensation for those injuries which the law will presume must naturally, proximately and necessarily result, including injuries to the feeling sand mental suffering endured in consequence, should be awarded; and that it is not required that the plaintiff introduce evidence that he has suffered special damage. In the Fields case, supra, the court declined to charge the jury "it is incumbent on the plaintiff to show to the jury evidence that he has suffered damage before he can ask you to award any to him." This Court held that the refusal to give the requested instruction was proper. The other cited cases are to like effect.
"Where the facts and nature of the action so warrant, actual damages include pecuniary loss, physical pain, and mental suffering . . . compensatory damages include all other damages than punitive, thus *Page 23 
embracing not only special damages as direct pecuniary loss but injury to feelings, mental anguish, etc." Baker v. Winslow, supra. "Compensatory damages include (1) pecuniary loss direct or indirect, i.e, special damages; (2) damages for physical pain and inconvenience; (3) damages for mental suffering; and (4) damages for injury to reputation." Osborn v.Leach, supra; Fields v. Bynum. supra; Barringer v. Deal, supra.
However, the fact that the law presumes that general damages result from the publication of a libel per se does not preclude the plaintiff from offering evidence of damages both general and special.
The plaintiff testified in substance that he had suffered mental anguish, humiliation and embarrassment as a result of the publication complained of. This evidence, together with the presumption of general damages resulting from the publication of the libel, entitled the plaintiff to the award of some damages, the amount of which it was the duty of the jury to determine.
A careful examination of the record and the briefs filed leads us to the conclusion that the exceptive assignments of error are without substantial merit.
No error.